

*1040607696*

CJ-18-3414
Andrews

# IN THE DISTRICT COURT FOR OKLAHOMA COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| (1)     MAE PENDLETON, <br> Special Administrator for <br> the Estate of MAURICE <br> PENDLETON, deceased, <br><br>          Plaintiff, <br><br> v. <br><br> (2)     BOARD OF COUNTY <br> COMMISSIONERS FOR <br> OKLAHOMA COUNTY, <br> OKLAHOMA, <br><br> (3)     P.D. TAYLOR, in his official and <br> individual capacity as Sheriff of <br> Oklahoma County, <br><br> (4)     WILLA JOHNSON, in her official <br> and individual capacity as <br> Commissioner for District 1, <br><br> (5)     BRIAN MAUGHAN, in his official <br> and individual capacity as <br> Commissioner for District 2, <br><br> (6)     RAY VAUGHN, in his official <br> and individual capacity as <br> Commissioner for District 3, <br><br>          Defendants. | **ATTORNEY LIEN CLAIMED** <br> **JURY TRIAL DEMANDED** <br><br> Case No.: **CJ-2018-3414** <br><br><br> FILED IN DISTRICT COURT <br> OKLAHOMA COUNTY <br><br> JUN 2 2 2018 <br><br> RICK WARREN <br> COURT CLERK <br> 43_____ |

## PETITION

Plaintiffs Mae Pendleton, as Special Administrator for the Estate of Maurice Pendleton, for

her cause of action against the above-named Defendants, states and alleges as follows:

# I.

## INTRODUCTION

1.      This action seeks declaratory relief from the court arising from unconstitutional conditions of confinement at the Oklahoma County Detention Center ("OCDC") that are pervasive, long-standing, and well documented by jail and community policymakers, including inadequate supervision and inmate-on-inmate violence.

2.      Specifically, the Estate seeks a declaration that conditions of confinement at the OCDC caused the death of Maurice Pendleton and deprived him of the fundamental constitutional right to safety and bodily integrity while in pretrial custody.

3.      Estate also seeks damages arising the death of Maurice Pendleton under the Fourteenth Amendment to the United States constitution, actionable pursuant to 42 U.S.C. § 1983, and damages under art. 2 § 7 of the Oklahoma state constitution, actionable pursuant to *Bosh v. Cherokee Cnty Governmental Bldg. Authy*, 2013 OK 9, 305 P.3d. 994.

# II.

## Parties, Jurisdiction, and Venue

4.      Mae Pendleton is the mother of Maurice Pendleton and the Special Administrator of his Estate as set forth in Oklahoma County District Court, Case No. PB-2017-1047 ("Estate").[1]

5.      The Board of County Commissioners for Oklahoma County ("Board") is the legislative entity with non-delegable statutory responsible for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates. *See* 57 O.S. § 41. Board is liable under state law for the actions of its employees under a theory of *respondeat*

---

[1] Estate will request a deadline to join prospective class representatives as part of the initial scheduling order.

*superior* consistent with the common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602, made applicable to Board here pursuant to the Oklahoma Supreme Court decision in *Bosh, supra*.

      6.     P.D. Taylor ("Taylor") was elected Sheriff of Oklahoma County Oklahoma in 2017. Prior to his election, Taylor was employed for 13 years as the Undersheriff for Oklahoma County. Pursuant to 57 O.S. § 47, Taylor is responsible for jail operations. Taylor is a final policy-maker under Oklahoma law. *See Reid v. Hamby*, 124 F.3d 217 (10th Cir. 1997). He is sued in both his official and individual capacities.

      7.     Willa Johnson ("Johnson"), Brian Maughan ("Maughan"), and Ray Vaughn ("Vaughn") (collectively referred to as "Commissioners"), are the elected County Commissioners for Oklahoma County. Johnson has been a Commissioner since 2007. Maughan has been a Commissioner since 2008. Vaughn has been a Commissioner since 2006.

      8.     On September 27, 2017, Estate served a notice of tort claim on Board. Estate was not served with any action on that notice.

      9.     Estate has satisfied all prerequisites to filing suit, and the complaints discussed below occurred in Oklahoma County, making jurisdiction and venue proper.

3

## III.

### STATEMENT OF FACTS

**A.   WHO WAS MAURICE DEWAYNE PENDLETON, JR. ("MR. PENDLETON")?**



10.    At the time of his death, Mr. Pendleton was a 36-year-old African-American male living in Midwest City, Oklahoma.  He was born on December 12, 1980 to Mae and Maurice Pendleton, Sr. He is survived by his four young children

11.    Mr. Pendleton was gainfully employed at Precision Parts & Remanufacturing ("Precision Parts") in Oklahoma City, Oklahoma, and was considered a "model employee"[2] and "a success story"[3] by Precision Parts.

---

[2] *See* email dated February 16, 2018 from Brandy McDonald to Mary G. Bowles, attached as Exhibit 1.
[3] See Mary Bowles' Affidavit dated January 8, 2018, at paragraph 14, attached as Exhibit 2.

12.     In addition to working full-time, Mr. Pendleton also attended school at OSU-Oklahoma City, and anticipated graduating in the summer of 2018 with a degree in Graphic Design while maintaining a 2.92 GPA.[4]

13.     July 18, 2017, when Mr. Pendleton Maurice's life was brutally cut short at the age of 36, his four (4) children lost a devoted and loving father and his parents lost a loving son.

## B.     THE BEATING DEATH OF MAURICE PENDLETON

14.     Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

15.     Records show that Maurice Pendleton was booked into the OCDC on July 11, 2017. He eventually posted bond, but for reasons unknown, the bond payment was mishandled and Mr. Pendleton was not released.

16.     Instead, jailers placed Mr. Pendleton to the 8th floor where he was locked inside a converted basketball court used as a holding pen for inmates facing disciplinary sanctions for misconduct.

17.     Notably, however, Maurice was not facing any disciplinary action, had paid his bond, and it is not even clear why jailers directed Maurice to the basketball court.

18.     The basketball court was not supervised by any jail staff, or even through video surveillance, and once locked inside, the inmates are not segregated; they are left unrestrained to freely roam about without restriction or oversight.

19.     Shortly after being locked inside the unsupervised area, Mr. Pendleton was confronted and attacked by at least four inmates based solely upon the belief that Mr. Pendleton had affiliated with a street gang years ago in his youth.   It should be noted that three of the four

---

[4] *See* Maurice Pendleton's Certified OSU-OKC College Transcript, attached as Exhibit 3.

5

inmates that attacked Mr. Pendleton were on the basketball court awaiting disciplinary hearings for attacking other inmates.

20.     Jail staff were housing these inmates on the basketball court precisely because they had a history of violence that exposed others to a substantial risk of serious harm.

21.     Testimony from inmate witnesses described Mr. Pendleton screaming for help and running for his life around the basketball court desperately trying to avoid these inmates. But try as he might, Mr. Pendleton was unable to outrun them, and there were no staff members supervising to assist him. Worn down, Mr. Pendleton was captured, savagely beaten, and kicked repeatedly in the head and body as a maintenance man looked on helplessly unable to open the door.

22.     To further insult and humiliate Mr. Pendleton, these inmates began stripping him naked as they beat him.

23.     This beating persisted until jailers finally arrived, but it was too late. Although Mr. Pendleton was still alive and conscience, the inmates had inflicted a substantial brain injury. The swelling and cerebral hemorrhaging continued after the beating was over and ultimately proved fatal, but not before Mr. Pendleton was able to consciously appreciate the unthinkable terror of his imminent death:

> **Date:** 07/18/2017 13:30          **Author:** LPN Morris, LPN, Tadasha
> PT WAS BROUGHT INTO CLINIC POST ALTERCATION. IT WAS REPORTED TO THIS NURSE BY OFFICERS THAT PT HAD FELL OUT IN FRONT OF THE ELEVATORS. PT LAID ON BED IN CLINIC. PT AAOX4. RESP EVEN AND UNLABORED  PT REQUESTING WATER. GAIT UNSTEADY. PT ABLE TO VERBALIZE NEEDS. HEMATOMA ABOVE RIGHT EYE. 2 SCRATCHES TO FOREHEAD. LEFT EYE SEEMS TO HAVE A BUSTED BLOOD VESSEL. PT AGITATED. UNABLE TO OBTAIN VITAL SIGNS D/T PT AGGRESSIVELY FLAILING ARMS AND LEGS. THIS NURSE GAVE PT WATER  WAITING FOR PT TO CALM DOWN TO FURTHER EVAL AND GET VITALS. PT KEPT TAKING OFF PULSE OX AND SITTING UP AND LAYING DOWN ON BED. PT STATES" IM GOING TO DO HELP ME. I M GOING DIE" PT LAYING ON BED WITH ANOTHER NURSE ATTEMPTING TO GET VITALS D/T PT NOT MOVING AGGRESSIVELY. THIS NURSE WENT TO ASSIST. PLACED PULSE OX ON PT LEFT INDEX FINGER. OBSERVED PT NOT BREATHING. CALLED FOR THE OTHER CLINIC NURSE AND OFFICER TO HELP ASSIST GET PT OFF BED TO PERFORM CPR. CPR INITIATED 1207. THIS NURSE WENT TO OBTAIN AMBU BAG TO ASSIST WITH RESCUE BREATHS. THIS NURSE INSTRUCTED ANOTHER NURSE TO NOTIFY DR CHILDS. CPR PERFORMED AED PLACED AT 1214. DR CHILDS CAME TO ASSIST AND EVAL. CPR CONTINUED UNTIL FIRE ARRIVED @ APPROX 1218. EMSA ARRIVED 1220. EMSA AND FIRE TOOK OVER CPR WITH THE ASSISTANCE OF 2 NURSES ASSISITING WITH RESCUE BREATHS. PT LEFT CLINIC ON GURNEY WITH EMSA AND FIRE @ 1235. PT PLACED IN EMSA 376. LEFT FACILITY @ 1241

24.     In the final hour before he died, Mr. Pendleton was exhausted, brutalized, and humiliated, but he never lost consciousness; he was fully aware of what happened, and he would have known in those terrifying moments that he would never again see his children or parents.

25.     At 36 years old, Mr. Pendleton was eventually pronounced dead. The Oklahoma Medical Examiner's Report lists his cause of death as: Traumatic Head Injury Sequela, manner of death: homicide. His postmortem toxicological studies were negative for drugs and alcohol.[5]

26.     He is survived by both parents and four children aged 16, 12, 12, and 3.

**B.     History of unconstitutional conditions at the OCDC**

27.     County policy makers and elected officials have known about the unconstitutional conditions at the OCDC that caused the death of Mr. Pendleton for over twenty years.[6]

28.     During that time, at least five (5) highly credible groups have studied and documented necessary reforms to bring the OCDC into constitutional compliance:

- Oklahoma County Grand Jury Report (1995)[7];

- Primary 9 Jail Committee, (2002)[8],

- Jail Funding Task Force (2003-07)[9],

---

[5] See September 13, 2017, *Report of Investigation by Medical Examiner*, completed by Chai S. Choi, M.D., attached as Exhibit 5.

[6] See, Adult Detention Advisory Committee's ("ADAC") Initial Report to Oklahoma County Board of County Commissioners, attached as Exhibit 6.

[7] On March 27, 1995, a Grand Jury was formed to investigate the ongoing problems in the OCDC. On October 27, 1995, the Grand Jury issued its Partial Report and noted that leaving pods unsupervised, a practice that continues even today, "should terminate immediately." *See* Exhibit 7 attached. Oklahoma County has **not** followed these recommendations.

[8] The committee met 17 times from March through November 2002 and delivered its report to the Board of County Commissioners on November 13, 2002. The committee recommended the creation of a trust to manage and operate the Jail. See ADAC Report, attached as Exhibit 6. Oklahoma County has **not** followed this recommendation.

[9] In the wake of the defeat of the 2003 ballot measure for a new jail, the County formed a Jail Funding Task Force to propose solutions to the Jail funding problems. On March 30, 2007, the Jail Funding Task Force received a report from Bill Garnos, then of The Facility Group. The Board

7

- Department of Justice, (Ongoing), and

- ADAC Report.

29.     The ADAC, which included some of the most respected members of the community, prepared a report pointedly stating that "all these [above] groups have recommended that the County take action. Unfortunately, the County has chosen to take no substantive action. Perhaps that is a result of a lack of resources or a lack of political will.  The Committee believes neither is an acceptable explanation. These issues have been studied over and over again, yet 13 years after the Grand Jury report the County has taken no action on any of these groups' recommendations. Lack of money is no excuse for continued violation of detainees' <u>Constitutional rights</u>…" [emphasis added.][10]

30.     In its conclusion, the ADAC was frank about the relationship between the OCDC and County policymakers in recognizing that "we ought to be ashamed of ourselves" and Oklahoma "County has received it's warning." [11]

31.     The County has failed to respond, time and again, as this tortured commentary on the state of affairs at the OCDC remains true today. And, in Maurice's case, the failure to respond resulted in the death of a father to four young children who will now be forced to find their way in this world without the love and guidance of their dad.

---

members were given a survey regarding opinions for renovation and expansion of the Jail. Chairman Vaughn collected the surveys and prepared a report of the results. The survey results indicated that those responding were in favor of adopting "all or part" of Garnos' recommendations. Oklahoma County has **not** followed those recommendations.

[10] *See*, ADAC Report attached as Exhibit 6.

[11] *Id.*

## C.    CONDITIONS OF CONFINEMENT AT THE OCDC

32.     In *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir 1999), the Tenth Circuit held that a plaintiff states a claim for deliberate indifference against a county's legislative body by producing evidence from which a reasonable inference can be drawn that "county commissioners failed to provide funding for correction of deficiencies . . . likely to lead to assaults against inmates." *Id.* at 763 ("Appellant has shown the requisite deliberate indifference . . . there is evidence that the county's legislative body was itself deliberately indifferent to conditions at the jail.").

33.     Oklahoma law requires every Board of County Commissioners in Oklahoma to provide a jail "for the safekeeping of prisoners lawfully committed." 57 Okla. Stat. § 41. This duty is constitutional as well as statutory. *See Bryson Okl. Cty. ex rel. Okl. Cty. Detention Center*, 261 P.3d 627, 637 (Okla. Civ. App. 2011). Also, "because the necessary maintenance of a jail is a constitutional duty, a county must first appropriate funds for such duty and any other constitutional duties before any county funds are expended for statutory duties or other functions." Okla. A.G. Opin., No. 07-35, 2007 WL 4699709 (Oct. 23, 2007).

34.     Contrary to this obligation, Board, the Commissioners, and Taylor have routinely prioritized spending on travel and other non-essential items instead of correcting deficiencies at the OCDC.

35.     The Annual Adopted Budget, Oklahoma County, Oklahoma, Fiscal Year 2016-2017 reveals hundreds of thousands of dollars diverted away from adequately funding the OCDC in favor of purchasing various non-essential items, including **$62,245** for "Culture and Recreation," **$35,550** in "membership fees," **$150,000** in "outside legal fees," **$69,888** in travel for the Sheriff's department, **$5,200** in travel for commissioner Johnson, **$6,500** in travel for commissioner Maughan, and **$7,422** in travel for commissioner Vaughn.

9

36.     The **$336,805**-plus spent in violation of the Board and the Commissioners' constitutional obligation would cover annual maintenance costs for the OCDC video surveillance system. It would also pay for numerous jail staff to monitor the basketball court during operational hours.

37.     Audits have also determined that Taylor's office failed to fund operations in favor of spending on vehicles.

38.     Among the "key findings" in the 2016 Investigative Audit of the Sheriff's Office was the discovery of "[a]pproximately $900,000 [] spent on the purchase of Sheriff vehicles during a time when other obligations of the Sheriff's Office were not being met."

39.     The decision by these policymakers to fund luxuries before correcting constitutional deficiencies reflects a well-entrenched indifference to the ongoing conditions at the OCDC.

40.     Either the Board failed to adequately fund Taylor's office to fulfill its constitutional duty to provide a facility that was adequate for the safekeeping of inmates, or Taylor's office squandered taxpayer money on luxuries instead of correcting the deficiencies that have existed for more than 20 years.

41.     As demonstrated below, the Board, Commissioners, Taylor, and Taylor's office had actual notice of deficiencies likely to result in inmate-on-inmate violence, and with indifference to the consequences, have failed to take any reasonable steps to correct them over the last 10 years.

**D.     INADEQUATE STAFFING AND SUPERVISION**

42.     Upon information and belief, Board, the Commissioners, Taylor, and Taylor's office have reviewed and know about each of the findings and conclusions set forth below.

10

43.     The physical plant for the OCDC has been the focus of government and media scrutiny for more than 20 years, but constitutional and statutory deficiencies persist. Token gestures to address deficiencies have not resulted in measurable improvement.

44.     As early as October 27, 1995, a Grand Jury admonished the County and noted that "leaving entire pods with no physical supervision for several hours is a dangerous practice." The Grand Jury report further stated "the alarming practice of locking down pods and detention officers being reassigned to other area in the jail thus leaving entire pods with no physical supervision for several hour (sic) should be terminated immediately."

45.     On July 31, 2008, the Department of Justice warned the county that inmates at the OCDC were not being supervised:

> In addition, detainees are often left unsupervised for extended periods of time. For example, our review of the Jails' Daily Staff Assignment and Inspection Reports for the month of April 2007 revealed that numerous housing unit security posts are not consistently staffed. Staff and detainees also reported that sight checks for detainees are not conducted as frequently as needed.

46.     In 2010, Board, the Commissioners, and Taylor's office entered into a Memorandum of Understanding ("MOU") with the Department of Justice. As part of the MOU, Board, the Commissioners, and Taylor's office agreed to "maintain in working order all cameras, alarms, and other monitoring equipment at the Jail."[12]

47.     As evidenced by Mr. Pendleton's beating death, however, Taylor and his office continued to house inmates in unsupervised areas at the OCDC.

48.     Not only did the failure to maintain operational surveillance equipment violate the MOU, the practice of leaving inmates unrestrained and without supervision openly violated the Oklahoma Jail Standards:

---

[12] *See* MOU at p. 10, attached as Exhibit 8.

11

> (c) Jailer posts shall be located and staffed to monitor all prisoner activity either physically or electronically and close enough to the living areas to respond immediately to calls for assistance, and respond to emergency situations. A jailer shall be on duty at all times at each location where prisoners are confined or the observation shall be conducted by closed circuit TV. The location shall be equipped with an intercommunication system that terminates in a location that is staffed twenty-four (24) hours-a-day and is capable of providing an emergency response.

*See* Okla. Admin. Code 310:670-5-3(c). And while the jail standards do not define constitutional parameters, those standards "provide persuasive authority concerning what is required." *Lopez*, 172 F.3d at 761.

49.     The jail standards were most recently modified in 2005, Board, the Commissioners, Taylor, and Taylor's office have known about inadequate supervision at the OCDC since 1995, and in 2010 they agreed to correct deficiencies likely to lead to inmate-on-inmate violence.

50.     Despite notice and opportunity to correct these deficiencies, and despite assurances that deficiencies would be corrected in fact, Board, the Commissioners, Taylor, and Taylor's office continued to house inmates in unsupervised locations, and to provide a facility that was adequate for the safe-keeping of inmates, both of which directly lead to the death of Maurice Pendleton.

### E.     INMATE-ON-INMATE VIOLENCE

51.     "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 834. Being violently assaulted in prison is not "part of the penalty that criminal offenders pay for their offenses against society." *Id.* (*quoting Rhodes*, 452 U.S. at 347). *See also Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir.1980).

52.     Mr. Pendleton was **not** convicted of anything; as a pretrial detainee, Mr. Pendleton enjoyed a constitutional right not to be subjected to conditions that amount to punishment. *See generally Bell v. Wolfish*, 441 U.S. 520 (1979). And in this case, Mr. Pendleton's injuries were directly caused by inmate-on-inmate violence.

12

53.     Inmate-on-inmate violence is a "condition of confinement" and it has been established since 1995 that officials may be liable for injuries caused by such violence if they were deliberately indifferent to harmful or dangerous conditions that are causally connected to that violence. *See Farmer v. Brennan*, 511 U.S. 825, *Lopez v. Lemaster*, 172 F.3d 756 (10th Cir. 1999), *Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998).

54.     The risk of harm from the threat of inmate-on-inmate violence is ever-present at the OCDC. A brief Internet search reveals numerous instances of inmate violence at the OCDC, and despite the perpetual atmosphere of assaults, Taylor and his office continued to use an unsupervised area to house offenders with disciplinary problems.[13] Upon information and belief, using the OCDC in this manner was directly related to the Board and Commissioners' failure to provide a facility that was adequate for the safe-keeping of inmates.

55.     Housing the most problematic inmates in an unsupervised location will predictably lead to additional instances of inmate-on-inmate violence, and despite the highly predicable or plainly obvious consequence of that decision, Mr. Pendleton was locked inside an unsupervised 8th floor basketball court, populated with inmates known to attack other inmates, with indifference to the consequences.

56.     These conditions are long-standing, well-documented, and known to the Board, Commissioners, Taylor, and his office.

**IV.**

---

[13] *See e.g.*, Nolan Clay, "Two suspects identified in homicide of inmate at Oklahoma County Jail," The Oklahoman, Jun. 5, 2017 (last visited Dec. 5, 2017); Kyle Schwab, "Oklahoma County jail inmate who admitted to fatally choking fellow inmate sentenced to 18 years in prison," The Oklahoman, Dec. 1, 2016 (last visited Dec. 5, 2017); Richard Linihan, "Kathy Costello Disgusted at Situation That Led to Son's Beating in OKC Jail" 1170 KFAQ, 2016 (last visited Dec. 5, 2017).

## IMMEDIATE NEED TO RESOLVE GROSS CONSTITUTIONAL AND STATUTORY DEFICIENCIES AT THE OCDC

57.     The brutal beating death of Mr. Pendleton is a stark reminder of the dangers associated with unconstitutional conditions of confinement.

58.     The deadly dangers have been known to the Oklahoma County for more than 20 years, and yet they persist.

59.     In fact, on July 31, 2008, the OCDC was informed "there is an inordinately high risk of detainee-on-detainee violence at the Jail as a result of the Jails chronic overcrowding, the staff's inability to supervise detainees, and the ability of detainees to bypass cell doors. Given all the other security issues discussed herein, the level of violence at the Jail is one of our most significant concerns. Such violence poses a serious risk of harm to both detainees and correction staff at the jail." [14]

60.     Resolving the supervision problem is critical in bringing the OCDC in-line with threshold custodial standards. With greater supervision, the OCDC will decrease the risk of harm to future inmates, which will create a jail facility that is better equipped to safely house inmates. Complying with these basic standards will promote safer conditions for staff and reduce future exposure to the County and its employees.

61.     The value to the community associated with implementing additional supervision measures is substantial. This is particularly true given the mandatory nature of supervision set forth in the jail standards.

---

[14] *See*, U.S. Department of Justice's Civil Rights Division's Report to Oklahoma County dated July 31, 2008, attached as Exhibit 9.

## V.

### STATEMENT OF CLAIMS

### CLAIM NO. 1
### FAILURE TO PROTECT
### FOURTEENTH AMENDMENT
### 42 U.S.C. § 1983

62. Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

63. Mr. Pendleton had a clearly established due process right to bodily integrity to be free from inmate-on-inmate violence. Defendants deprived Mr. Pendleton of that right by adopting policies and/or practices that substantially increased the risk of harm to an identifiable population of inmates by permitting or requiring jailers to house non-violent pretrial detainees in unsupervised locations with unrestrained inmates known to harbor a propensity for inmate-on-inmate violence. Defendant enacted or enforced these policies or practices with indifference to the consequences. The acts or omissions of the Defendants violated the Fourteenth Amendment rights of Mr. Pendleton, actionable through 42 U.S.C. § 1983, for which the Defendants are liable to the Estate.

### CLAIM NO. 2
### FAILURE TO PROTECT
### ART. 2 § 7
### *BOSH* CLAIM

64. Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

65. Mr. Pendleton had a clearly established due process right to bodily integrity to be free from inmate-on-inmate violence. Defendant Board, through its employees or elected officials, deprived Mr. Pendleton of that right by housing non-violent pretrial detainees in unsupervised locations with unrestrained inmates known to harbor a propensity for inmate-on-inmate violence.

15

The acts or omissions of Board violated due process rights of Mr. Pendleton, actionable through *Bosh*, *supra*, for which Board is liable to the Estate.

### CLAIM NO. 3
### INADEQUATE SUPERVISION
### FOURTEENTH AMENDMENT
### 42 U.S.C. § 1983

66.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

67.    Mr. Pendleton had a clearly established due process right to adequate supervision to prevent instances of inmate-on-inmate violence that are either a highly predictable or plainly obvious consequence of the policies and practices enacted by the Board, Commissioners, Taylor, and his office, or were caused by policies or practices either known to and disregarded by the Defendants or arise from prior tortious conduct that would put them on notice. These Defendants deprived Mr. Pendleton of that right by enacting policies and practices that substantially increased the risk of harm to him consistent with the allegations set forth above for which these Defendants are liable to the Estate pursuant to 42 U.S.C. § 1983.

### CLAIM NO. 4
### INADEQUATE SUPERVISION
### ART. 2, § 7
### *BOSH* CLAIM

68.    Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

69.    Mr. Pendleton had a clearly established due process right to adequate supervision to prevent instances of inmate-on-inmate violence, and as demonstrated above, Board, through its employees or elected officials, enacted policies and practices that substantially increased the serious risk of harm to Mr. Pendleton from inmate-on-inmate violence consistent with the

16

allegations set forth above for which the Board is liable to the Estate pursuant to art. 2, § 7 of the Oklahoma constitution.

### CLAIM NO. 5
### CONDITIONS OF CONFINEMENT
### FOURTEENTH AMENDMENT
### 42 U.S.C. § 1983

70.     Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

71.     Mr. Pendleton had a clearly established due process right to conditions of confinement that satisfy basic constitutional requirements for housing pretrial detainees in an adult local detention facility. Defendants violated that right by enacting policies or practices that, when taken together, deprived Mr. Pendleton of the right to life and liberty in violation of the Fourteenth Amendment for which the Board, Commissioners, Taylor, and his office are liable to the Estate.

### CLAIM NO. 6
### CONDITIONS OF CONFINEMENT
### ART. 2 § 7
### *BOSH* CLAIM

72.     Estate adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

73.     Mr. Pendleton had a clearly established due process right to conditions of confinement that satisfy basic constitutional requirements for housing pretrial detainees in an adult local detention facility. Defendant Board, through its employees or elected officials, violated that right by enacting policies or practices that, when taken together, deprived Mr. Pendleton of the right to life and liberty in violation of the Oklahoma constitution for which the Board is liable to the Estate.

17

# VI.

## REQUEST FOR RELIEF

74.     Based on the foregoing allegations, the Estate respectfully requests the following relief:

A.      Estate requests compensatory damages against all Defendants in an amount that exceeds $75,000.00;

B.      Estate requests punitive damages against Taylor and the Commissioners in an amount that exceeds $75,000.00;

C.      Nominal damages against all Defendants;

D.      Declaratory judgment determining that Defendants' acts or omissions violated the constitutional rights of Maurice Pendleton;

E.      An award of reasonable attorney's fees and costs;

F.      Any other relief permitted by law;

G.      Any other relief the Court deems just and equitable.

Respectfully submitted,

M. David Riggs, OBA No. 7583
Damario Solomon-Simmons, OBA No. 20340
RIGGS, ABNEY, NEAL, TURPEN,
    ORBISON & LEWIS
502 West 6th Street
Tulsa, Oklahoma 74119
(918) 587-3161 - Phone
(918) 587-9708 – Facsimile
dsimmons@riggsabney.com

and

18

Melvin C. Hall, OBA No. 3728
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS
528 NW 12th Street
Oklahoma City, Oklahoma 73103
(405) 843-9909 - Phone
(405) 842-2913 - Facsimile
mhall@riggsabney.com


J. Spencer Bryan, OBA No. 19419
BRYAN & TERRILL
9 East 4th St., Suite 307
Tulsa, Oklahoma 74103
(918) 935-2777 – Phone
(918) 935-2778 – Facsimile
jsbryan@bryanterrill.com

ATTORNEYS FOR PLAINTIFF

## Bobbye Meisenheimer

| | |
|---|---|
| **From:** | Mary G. Bowles <Mary.Bowles@pprok.com> |
| **Sent:** | Friday, February 16, 2018 9:04 AM |
| **To:** | Bobbye Meisenheimer |
| **Cc:** | Brandy McDonald |
| **Subject:** | FW: Maurice Pendleton |

Good Morning,

Pl see the information below from our HR Coordinator.
Let us know if you need anything else.

Thank you,

*Mary Bowles*

Precision Parts & Remanufacturing
Core Mgr/Logistics Coordinator
5201 W Reno, Unit F
Oklahoma City, Ok 73127
mary.bowles@pprok.com
Phone: 405-609-6695
Fax: 405-681-2596

————————N O T I C E————————
The information contained in this message and any attachments may contain personal,
confidential and privileged information and is intended only for the sole use of the
designated recipient. If you are not the intended recipient, please do not read, copy,
distribute, use or disclose it to anyone else. If you have received this e-mail message
in error, please notify the sender by replying to this message and then deleting it from
your computer. Thank you.

**From:** Brandy McDonald
**Sent:** Friday, February 16, 2018 9:00 AM
**To:** Mary G. Bowles <Mary.Bowles@pprok.com>
**Subject:** Maurice Pendleton

Mary,

Maurice's ending pay rate was. $14.65 an hour. Pay increase were as follows – 10/13/13 – .35 - orientation – 10/13/13 ,
Merit - .50  - 7/23/14 – .35 – orientation - 8/13/14 – 1.00 merit
1/1/15 – 1.50 merit – 7/2/15 1.00 merit – 7/9/15 – evaluation .75 – 7/8/16 - .70 evaluation.

Maurice had Medical insurance Blue Cross Blue shield he had a life insurance policy,  he had dental insurance. He was
paying his child support on time.  Maurice was a model employee.

Let me know if you need anything else.

Thanks,



**EXHIBIT 1**

## <u>AFFIDAVIT OF MARY BOWLES</u>

STATE OF OKLAHOMA       )
                                : ss.
COUNTY OF OKLAHOMA    )

I, Mary Bowles, being of legal age and being first duly sworn, depose and state as follows:

1.       I am a resident of Oklahoma County, Oklahoma and work as a Core Manager/Logistics Coordinator at Precision Parts and Remanufacturing ("Precision Parts") in Oklahoma City, Oklahoma.

2.       I was the direct supervisor of Maurice Dewayne Pendleton, who was employed at Precision Parts as a Core Tech/Identifier.

3.       Mr. Pendleton was employed by Precision Parts from 2009 to 2011, and was rehired on July 9, 2013 at a salary of $8.50 an hour. From 2011 to 2013, I held his position open and hired him back in 2013. Mr. Pendleton was a full-time employee of Precision Parts from July 9, 2013 until the date of his death.

4.       From October 1, 2013 through July 9, 2015, Mr. Pendleton received either a merit or annual evaluation pay increase at my recommendation, as he continually received high marks on our Personnel Performance Review form.

5.       Mr. Pendleton's last annual evaluation in which he received a raise to $14.65 per hour was on July 8, 2016. My comments on his evaluation were "Maurice takes the initiative to work on his own. He follows direction and I do not have to check his work."

6.       In July 2015, I requested both an annual evaluation and merit raise for Mr. Pendleton, commenting at his annual evaluation that "Maurice is a pleasure to work with. He has a good disposition and is always in a good mood. He is calm and laid back and does not let the pressure get to him." For the merit raise, my comments were "Maurice always goes above &

**EXHIBIT 2**

beyond his job duties to make sure everything runs correctly in the Core Dept. He has also handled all the large shipments we have been receiving with no mistakes."

7.      In 2013, our department was able to cut out a position because of the excellent work that Mr. Pendleton was doing for Precision Parts.

8.      Mr. Pendleton worked well with his fellow employees, was responsible, reliable and a valued employee at Precision Parts.

9.      It is my opinion that based upon Mr. Pendleton's past performance reviews at Precision Parts, he would have continued to receive both annual evaluation and merit raises.

10.     I am aware that Mr. Pendleton was completing his college degree in design, and obtaining his degree would have made him eligible to transfer to our Drafting and Design Department. This would have been a salaried position, and he could have made up to $18.00 an hour for a 40-hour week. He would have continued to be eligible for annual review and merit raises of approximately 2%. Mr. Pendleton and I talked often about his schooling and the difference it would make in his life.

11.     If Mr. Pendleton had decided to stay his present department, he would have been eligible to be an Assistant Supervisor for an additional $1.00 per hour; a Supervisor for an additional $1.00 beyond the Assistant Supervisor position; or a Manager for an additional $2.00 an hour beyond the Supervisor position.

12.     For the Assistant Supervisor and Supervisor positions, Mr. Pendleton would have been eligible for annual review and merit raises (up to three per year). In the Manager position, he would have been eligible for a 4% raise per year.

2

13.    As Mr. Pendleton was a valued employee and based on his past reviews, I have no hesitation in stating that he would have progressed with Precision Parts and could have transferred to the Drafting and Design Department or become a Manager.

14.    I called Mr. Pendleton my success story.  He came from a bad situation and turned his life around.  Family was always first to him.

Further affiant sayeth not.

_Mary Bowles_

Mary Bowles

Subscribed and sworn to me this _8th_ day of January, 2018.

_____

NOTARY PUBLIC

My Commission Expires:

_11-09-21_

# EXHIBIT 3
# Oklahoma State University-Oklahoma City

Office of the Registrar
900 N. Portland Ave.
Oklahoma City, Oklahoma 73107-6195

**Official Transcript**

Issued To:

Maurice Pendleton
2300 Towers Ct
Oklahoma City, OK 73111

17-JAN-2018     Page:  1

Maurice Dewayne Pendleton

DOB     12-DEC-XXXX
Last 4 SSN *****8669

Level:  Undergraduate

---

Current Program
Associate in Applied Science
    College : Division of Liberal Arts
      Major : Graphic Design
    Opt/Concentration : Illustration/Multimedia

| SUBJ NO. | COURSE TITLE | CRED GRD | PTS R |
|---|---|---|---|
| **INSTITUTION CREDIT:** | | | |
| **Fall 2014** | | | |
| CIS  1113 | COMP CONCEPTS W/APPS | 3.00 B | 9.00 |
| ICSM 0103 | PRE-ALGEBRA ON COMPUTER | 3.00 DEV-A | 12.00 |
| Ehrs: 3.00 GPA-Hrs: 3.00 | QPts: | 9.00 GPA: | 3.00 |
| **Spring 2015** | | | |
| GDD  2233 | COMPUTER ANIMATION | 3.00 B | 9.00 |
| ICSM 0123 | INTRO ALGEBRA | 3.00 DEV-C | 6.00 |
| Ehrs: 3.00 GPA-Hrs: 3.00 | QPts: | 9.00 GPA: | 3.00 |
| **Summer 2015** | | | |
| GDD  1253 | COMPUTER GRAPHIC ILLUSTRATION | 3.00 A | 12.00 |
| HIST 1493 | US HIST SINCE 1865-INCLUDE-ED | 3.00 B | 9.00 |
| Ehrs: 6.00 GPA-Hrs: 6.00 | QPts: | 21.00 GPA: | 3.50 |
| Vice President's List | | | |
| **Fall 2015** | | | |
| GDD  2323 | MULTIMEDIA COMPUTING | 3.00 B | 9.00 |
| ICSM 0213 | INTERMEDIATE ALGEBRA | 3.00 DEV-C | 6.00 |
| Ehrs: 3.00 GPA-Hrs: 3.00 | QPts: | 9.00 GPA: | 3.00 |
| **Spring 2016** | | | |
| GDD  2423 | ADVANCED MULTIMEDIA | 3.00 A | 12.00 |
| MATH 1513 | COLLEGE ALGEBRA | 3.00 F | 0.00 E |

**************** CONTINUED ON NEXT COLUMN *****************

| SUBJ NO. | COURSE TITLE | CRED GRD | PTS R |
|---|---|---|---|
| **Institution Information continued:** | | | |
| Ehrs: 3.00 GPA-Hrs: 3.00 | QPts: | 12.00 GPA: | 4.00 |
| **Summer 2016** | | | |
| POLS 1113 | AMERICAN GOVERNMENT | 3.00 B | 9.00 |
| PSYC 1113 | INTRO PSYCHOLOGY | 3.00 B | 9.00 |
| Ehrs: 6.00 GPA-Hrs: 6.00 | QPts: | 18.00 GPA: | 3.00 |
| Vice President's List | | | |
| **Fall 2016** | | | |
| ENGL 1113 | English Composition I | 3.00 B | 9.00 |
| GDD  1313 | Internet Tech and Tools | 3.00 C | 6.00 |
| GDD  1463 | Cmptr Art: Adobe Illustrator | 3.00 D | 3.00 |
| Ehrs: 9.00 GPA-Hrs: 9.00 | QPts: | 18.00 GPA: | 2.00 |
| **Spring 2017** | | | |
| GDD  1333 | Adobe InDesign I | 3.00 A | 12.00 |
| MATH 1513 | College Algebra | 3.00 C | 6.00 I |
| Ehrs: 6.00 GPA-Hrs: 6.00 | QPts: | 18.00 GPA: | 3.00 |
| Vice President's List | | | |

*********************** TRANSCRIPT TOTALS ***********************

| | Earned Hrs | GPA Hrs | Points | GPA |
|---|---|---|---|---|
| TOTAL INSTITUTION | 39.00 | 39.00 | 114.00 | 2.92 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 39.00 | 39.00 | 114.00 | 2.92 |

******************** END OF TRANSCRIPT ********************

**EXHIBIT 3**

AN OFFICIAL SIGNATURE IS WHITE WITH A GRAY BACKGROUND ● REJECT DOCUMENT IF SIGNATURE BELOW IS DISTORTED

This officially sealed and signed transcript is printed on security paper with the name of the university printed in white type across the face of the document. A raised seal is not required. THE FACE OF THIS DOCUMENT IS TWO-COLOR INK ON WHITE PAPER. A BLACK ON WHITE OR COLOR COPY SHOULD NOT BE ACCEPTED.




Lyndsay Pittman, Registrar

OFFICIAL TRANSCRIPT IS PRINTED ON SECURITY PAPER AND DOES NOT REQUIRE A RAISED SEAL   ●   A BLACK AND WHITE TRANSCRIPT IS NOT OFFICIAL

DO NOT ACCEPT THIS DOCUMENT UNLESS A TRUE WATERMARK IS VISIBLE - HOLD UP TO LIGHT TO VIEW   ●   TRANSCRIPT GUIDE PRINTED ON BACK

# Four inmates charged in Oklahoma County jail death

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

newsok.com/article/5558678

Nolan Clay                                                                                      August 2, 2017



Four inmates were charged Wednesday with first-degree manslaughter after an investigation into the latest death at the overcrowded Oklahoma County jail.

Acting Sheriff P.D. Taylor called the attack gang-related and said he is making changes to prevent a similar tragedy.

"I'll never give up," he said.

The inmates are accused of beating and stomping Maurice D. "Little Smoke" Pendleton around 11:45 a.m. July 18 after his video arraignment on an assault charge.

Pendleton, 36, of Midwest City, was pronounced dead hours later after being taken to a hospital.

Charged were Martaveous Dwayne Gillioms, 20; Hareth Hameed, 18; Antonio Dewayne Ligons, 35; and Todd Alan Miller, 31.

Witnesses reported the inmates "surrounded Pendleton like he was a 'prey'" and began assaulting him after he disclosed what gang he "claimed," a sheriff's investigator reported in a court affidavit.

Pendleton had answered he was from "Hoover," according to the affidavit.

"Miller was identified as the one who repeatedly slammed the victim to the ground as others

**EXHIBIT 4**

1/3

punched and kicked him," the investigator, Sgt. Bruce Henley, reported. "Ligons was identified as the one who first started assaulting the victim."

The assault took place on the jail's eighth floor in an area known as the basketball court, authorities said.

The acting sheriff said he will meet with jail administrators Thursday about changes.

"There will be no more people put out there on the basketball court as a holding facility," Taylor said. "He had just been arraigned and they put him in there to hold him until some of them could take him to his cell. And they put him in there with super bad dudes."

The acting sheriff described the victim and his assailants as being in the same gang but from different areas.

"It's sad," he said of the gang rivalries. "You've got to separate them and now you've got to attempt to separate those involved in the same gang."

The acting sheriff also said two of the inmates charged Wednesday already were facing murder charges and "felt like they didn't have anything to lose."

Gilloms was charged with second-degree murder after a fatal shooting in January in Oklahoma City. He told police he had recently been released from prison, court records show.

Hameed was charged with first-degree murder after a fatal shooting in December in Oklahoma City.

Pendleton's family is considering taking legal action.

"Right now, they want to know all of the facts. They want to know the truth about whatever it is," the family's attorney, David Slane, said Wednesday. "They want to look at everybody involved. There's some concern about did he receive proper medical treatment, both from the jail and on over to the hospital. They're concerned about was he left in the wrong area or alone and why didn't this get stopped.

"They've got lots of questions like that. They just don't have answers yet," Slane said.

The attorney said Taylor has agreed to sit down with the family and go over what happened.

Pendleton was accused in his assault charge of shooting another man early July 9 following an altercation at a Midwest City apartment complex.

Related to this story

Show more 0



Nolan Clay

- 

Nolan Clay was born in Oklahoma and has worked as a reporter for The Oklahoman since 1985. He covered the Oklahoma City bombing trials and... read more ›

## Subscribe to NewsOK's Daily News Headlines

Stay informed with a wide selection of the top news, sports, entertainment and lifestyle headlines. Delivered twice daily.   View sample

NewsOK.com has disabled the comments for this article.

BOARD OF MEDICOLEGAL INVESTIGATIONS
## OFFICE OF THE CHIEF MEDICAL EXAMINER

Central Office
901 N. Stonewall
Oklahoma City, OK 73117
(405) 239-7141 Phone - (405) 239-2430 Fax

Eastern Division
1115 West 17th Street
Tulsa, Oklahoma 74107
(918) 295-3400 Phone - (918) 585-1549 Fax

OFFICE USE ONLY

Re _____ Co _____

I hereby certify that this is a true and correct copy of the original document. Valid only when copy bears imprint of the office seal.

By _____
Date _____

### REPORT OF INVESTIGATION BY MEDICAL EXAMINER

| DECEDENT First-Middle-Last Names (Please avoid use of initials)<br>MAURICE   PENDLETON | Age<br>36 | Birth Date<br>12/12/1980 | Race<br>BLACK | Sex<br>M |
|---|---|---|---|---|

HOME ADDRESS - No. - Street, City, State
1702 CENTER DR APT 1, MIDWEST CITY, OK

| EXAMINER NOTIFIED BY - NAME - TITLE (AGENCY, INSTITUTION, OR ADDRESS)<br>AMBER COOK, ST ANTHONY ICU | | | DATE<br>07/18/2017 | TIME<br>17:26 |
|---|---|---|---|---|
| INJURED OR BECAME ILL AT (ADDRESS)<br>OKLAHOMA COUNTY JAIL | CITY<br>OKLAHOMA CITY | COUNTY<br>OKLAHOMA | TYPE OF PREMISES<br>JAIL | DATE 07/18/2017 TIME Unknown |
| LOCATION OF DEATH<br>ST ANTHONY ICU | CITY<br>OKLAHOMA CITY | COUNTY<br>OKLAHOMA | TYPE OF PREMISES<br>HOSPITAL | DATE 07/18/2017 TIME 17:03 |
| BODY VIEWED BY MEDICAL EXAMINER<br>901 N STONEWALL | CITY<br>OKLAHOMA CITY | COUNTY<br>OKLAHOMA | TYPE OF PREMISES<br>AUTOPSY SUITE | DATE 07/19/2017 TIME 08:45 |

IF MOTOR VEHICLE ACCIDENT:   ☐ DRIVER   ☐ PASSENGER   ☐ PEDESTRIAN

TYPE OF VEHICLE:   ☐ AUTOMOBILE   ☐ LIGHT TRUCK   ☐ HEAVY TRUCK   ☐ BICYCLE   ☐ MOTORCYCLE   ☐ OTHER: _____

**DESCRIPTION OF BODY**

| | RIGOR | LIVOR | EXTERNAL OBSERVATION | | NOSE | MOUTH | EARS |
|---|---|---|---|---|---|---|---|
| EXTERNAL PHYSICAL EXAMINATION | Jaw  Complete ☑<br>Neck  Absent ☐<br>Arms  Passing ☐<br>Legs  Passed ☐<br>Decomposed ☐ | Color PURPLE<br>Lateral ☐<br>Posterior ☑<br>Anterior ☑<br>Regional ____ | Beard YES          Hair BLOND<br>Eyes: Color BROWN     Mustache YES<br>Opacities HEMORRHAGE, RIGHT<br>Pupils: R 4 MM    L 3 MM<br>Body Length 72 IN   Body Weight 212 | BLOOD<br>OTHER | ☐<br>☐ | ☐<br>☐ | ☐<br>☐ |

Significant observations and injury documentations - (Please use space below)
SEE AUTOPSY PROTOCOL

Probable Cause of Death:
TRAUMATIC HEAD INJURY SEQUELA

Other significant conditions contributing to death (but not resulting in the underlying cause given)
SMALL VESSEL DISEASE OF HEART, EMPHYSEMA OF LUNG

| Manner of Death: | | Case disposition: |
|---|---|---|
| Natural ☐ | Accident ☐ | Autopsy        YES |
| Suicide ☐ | Homicide ☑ | Authorized by  CHAI S. CHOI M.D. |
| Unknown ☐ | Pending ☐ | Pathologist    CHAI S. CHOI M.D.<br>Not a medical examiner case ☐ |

**MEDICAL EXAMINER:**
Name, Address and Telephone No.

CHAI S. CHOI  M.D.
901 N. STONEWALL
OKLAHOMA CITY, OK 73117

I hereby state that, after receiving notice of the death described herein, I conducted an investigation as to the cause and manner of death, as required by law, and that the facts contained herein regarding such death are true and correct to the best of my knowledge.

Signature of Medical Examiner
Computer generated report

CHAI S. CHOI M.D.
**1703729**

07/18/2017
Date Generated

09/13/2017
Date Case Finalize

**EXHIBIT 5**



Board of Medicolegal Investigations
**Office of the Chief Medical Examiner**
901 N. Stonewall
Oklahoma City, Oklahoma 73117
(405) 239-7141 Voice
(405) 239-2430 Fax

**CERTIFICATION**
I hereby certify that this document is a true and correct copy of the original document. Valid only when copy bears imprint of the office seal.

By _____

Date _____

## REPORT OF AUTOPSY

| | | | | | |
|---|---|---|---|---|---|
| **Decedent**<br>**MAURICE PENDLETON** | **Age**<br>36 | **Birth Date**<br>12/12/1980 | **Race**<br>BL | **Sex**<br>M | **Case No**<br>1703729 |
| **Means**<br>Violent, unusual, unnatural | **ID By**<br>Toe tag | | | **Authority for Autopsy**<br>CHAI S. CHOI, M.D. | |

**Present at Autopsy**
Ashley Welch

### FINDINGS

   I. Heart (370 gm):
      A. No significant coronary artery disease.
      B. Segmental small vessel disease.
      C. Mild ventricular hypertrophy; focal interstitial fibrosis, high septum.
  II. Acute pulmonary congestion with edema (combined weight 1530 gm):
      A. Anthracosis, moderate with apical emphysema, bilateral.
 III. Head trauma, blunt force:
      A. Large subscalpular and subgaleal contusions, right frontal and temporal region, acute.
      B. Contusion, approx. 3 cm, just above the right eyebrow.
      C. Brain and meninges; acute congestion (1350 gm).
 IV. Acute contusion, approx. 3 cm just above the right elbow.
  V. Medical applications present.
 VI. Postmortem toxicological studies; negative for drugs and alcohol.

---

**CAUSE OF DEATH:**     TRAUMATIC HEAD INJURY SEQUELA
**DUE TO:**

**OSC:**     SMALL VESSEL DISEASE OF HEART, EMPHYSEMA OF LUNG
**MANNER OF DEATH:**     HOMICIDE

The facts stated herein are true and correct to the best of my knowledge and belief.

*Chai S. Choi, m, D*     OCME Central Division     7/19/2017 8:45 AM

| CHAI S. CHOI, M.D. | Pathologist | Location of Autopsy | Date and Time of Autopsy |
|---|---|---|---|

CME-2

1

CASE NO.  1703729

## EXTERNAL EXAMINATION

### DESCRIPTION

| Height | Weight | Eyes | Pupils | Opacities, Etc. | Hair | Beard | Mustache | Circumcised |
|--------|--------|------|--------|-----------------|------|-------|----------|-------------|
| 72 in. | 212 lbs. | Brown | R 4 mm  L 3 mm | | Black | Yes | Yes | Yes |

| RIGOR (jaw, neck, back, legs, arm, chest, abd., complete) | LIVOR (color, anterior, posterior, lateral, regional) | Body Heat |
|---|---|---|
| Complete | Purple, posterior | COOL |

### DESCRIPTION OF CLOTHING:

Hospital gown

### MEDICAL APPLICATION:

- Temperature monitors attached to the forehead
- Orogastric tube and endotracheal tube intubation
- Double needle catheters in the right lateral neck
- Triple lumen catheters in the right side of the neck
- Two electrode pads over the chest
- Seven monitor pads over the chest and abdomen
- Blood pressure cuff on the left arm
- Needle placement in the right antecubital fossa, left forearm, and dorsum of the left hand
- Single catheter placed in left femoral region
- Puncture mark with tape on the right forearm and left wrist
- Hospital identification band on the left wrist
- Foley catheter placement with a bag with no urine

### BODY MARKS AND SCARS:

- Multiple tattoos over the upper chest, right arm, and epigastrium.
- A 5 x 0.5 cm elongated scar on the dorsum of the right hand.
- Two pigmented scars on the left shin, measuring 1 and 0.4 cm.

### INJURIES:

- An approximately 3 cm purple contusion just above the right eyebrow

### EXTERNAL EXAMINATION:

The body is that of a well-developed and nourished black adult male. The scalp hair is tightly curled, approximately ¼ inch long. The conjunctivae are slightly congested with conjunctival hemorrhages at the lateral right eye. There is no blood in the nose, mouth, or ear canals. The inside of mouth is natural and is in fair condition. The neck is otherwise unremarkable. The chest is of normal contour and is unremarkable. The abdomen is flat and is unremarkable. The genitalia are those of a circumcised normal adult male and are unremarkable. Anal skin is intact. The extremities are symmetrical. The back is unremarkable.

2

CASE NO. 1703729

## GROSS EXAMINATION

The body is opened through the customary "Y" shaped incision.

Subcutaneous fat is normally distributed (0.5 cm and 1.5 cm in thickness of chest and abdominal fat), moist, and bright yellow. The musculature through the chest and abdomen is rubbery, maroon, and shows no gross abnormality.

The sternum is removed in the customary fashion. The organs of the chest and abdomen are in normal position and relationship. The liver edge extends 0 cm below the right costal margin at the midclavicular line. The diaphragms are intact bilaterally.

### PARIETAL PLEURA:

Smooth, glistening membrane without associated adhesions or abnormal effusions.

### PERICARDIUM:

Is a smooth, glistening, intact membrane, and the pericardial cavity, itself, contains the normal amount of clear, straw-colored fluid.

### PERITONEUM:

Smooth, glistening membrane in both the abdominal and pelvic cavities. The peritoneal cavity contains no abnormal fluid or adhesions.

### HEART:

Weighs 370 gm. It has a normal configuration and location. There are no adhesions between the parietal and visceral pericardium, and the latter is a smooth, glistening, fat laden characteristic membrane. The coronary arteries arise and distribute normally and are patent. There is a concentric left ventricle. The coronary ostia are normally located and widely patent. The chambers and atrial appendages are unremarkable. The valves are normally formed and measure as follows: tricuspid 13.0 cm, pulmonic 8.0 cm, mitral 11.0 cm, and aortic 7.0 cm. The endocardium is a smooth and glistening with scattered purplish congestion of the left ventricle. The myocardium is intact, rubbery, and red-tan, with the left ventricle measuring 1.5 cm, the septum measuring 1.5 cm, and the right ventricle measuring 0.3 cm. The papillary muscles and chordae tendineae are intact and unremarkable. The arch of the aorta is classically formed with minimal atherosclerosis. Other great vessels also arise and distribute normally and are widely patent.

### NECK ORGANS:

Musculature is normal, rubbery, and maroon, and the organs are freely movable in a midline position. The tongue is intact and normally papillated, without evidence of tumor or hemorrhage. The hyoid bone is intact. The thyroid cartilage is intact and without abnormality. The thyroid gland weighs 30 gm, is symmetric, rubbery, light tan to maroon, and in its normal position without evidence of neoplasm. The epiglottis is a characteristic plate-like structure which shows no evidence of edema, trauma, or other gross pathology. The larynx is comprised of unremarkable vocal cords and folds, is widely patent without foreign material, and is lined by a smooth, glistening membrane. There are no petechiae of the epiglottis, laryngeal mucosa, or thyroid capsule.

CASE NO. 1703729

**THYMUS:**

No significant tissue is identified grossly.

**LUNGS:**

The right lung weighs 850 gm and the left weighs 680 gm. Visceral pleurae are smooth, glistening, and intact with moderate anthracosis and focal bulla formation at the apex, bilateral. The overall configuration is normal. The trachea is widely patent and lined by characteristic pink membrane. Likewise, the major bronchi and bronchioles bilaterally are patent, normally formed, and contain no significant occlusive material. The pulmonary arterial tree is free of emboli or thrombi. The parenchyma is uniformly spongy, varies from pink-tan to dark purple, and exudes moderate amounts of blood and clear, frothy edema fluid from its cut surfaces. There is no evidence of consolidation, granulomatous, or neoplastic disease. Hilar lymph nodes are within normal limits with relation to size, color, and consistency.

**G.I. TRACT:**

The esophagus shows an unremarkable mucosa, a patent lumen, and no evidence of gross pathology. The esophagogastric junction is unremarkable. The stomach is of normal configuration, is lined by a diffusely congested and ecchymotic mucosa and contains approximately 120 gm of dark brownish mucoid material with no food. The duodenum, itself, is patent, shows an unremarkable mucosa and no evidence of acute or chronic ulceration. Jejunum and ileum are unremarkable and contain soft brown fecal material. There is no Meckel's diverticulum. The ileocecal valve is intact and unremarkable. The appendix is present. The colon is examined segmentally and shows no evidence of neoplasm or trauma. There are no diverticula. Anus and rectum are unremarkable.

**LIVER:**

Weighs 1830 gm. It is of normal configuration, rubbery, tan, and intact. Cut surface shows reddish purple congestion.

**GALLBLADDER:**

Lies in its usual position, contains liquid bile, no calculi, and shows an unremarkable mucosa. The biliary tree is intact and patent without evidence of neoplasm or calculi.

**PANCREAS:**

Weighs 180 gm. Lies in its normal position, shows a normal configuration, is pink-tan and characteristically lobulated with no apparent gross pathology.

**SPLEEN:**

Weighs 140 gm. The capsule is intact. The organ is rubbery, maroon, and shows characteristic follicular pattern.

**ADRENALS:**

Lie in their usual location, show finely yellow granular cortices and tan to gray medullae.

CASE NO. 1703729

## KIDNEYS:

The right kidney weighs 150 gm and the left weighs 160 gm. Both are configured normally with no abnormality. Sections show the organs to be moderately congested with unremarkable cortices, medullae and pelves. Ureters and blood vessels are patent and unremarkable.

## URINARY BLADDER:

Contains a scanty amount of urine. Its serosa and mucosa are unremarkable.

## MALE GENITALIA:

The prostate is symmetric, rubbery, gray-tan, and of normal size. The prostatic urethra is unremarkable. The testes are bilaterally present and show no evidence of tumor, trauma, or inflammation. The investing membranes are unremarkable as is the epididymis.

## BRAIN AND MENINGES:

The scalp is opened through the customary intermastoid incision and shows large subscalpular contusions over the right frontal and right temporal region, 8 and 4 cm in greatest dimension. Temporal muscle is intact. There are regional subgaleal hemorrhages. The calvarium is removed through the use of an oscillating saw and is intact without evidence of osseous disease. The brain weighs 1350 gm. Dura and leptomeninges are smooth, glistening, translucent, and unremarkable without evidence of trauma. Cranial nerves and circle of Willis arise and distribute normally and show no significant pathology. Externally, the brain is normally configured and symmetric, and multiple serial sections of cerebral hemispheres, pons, medulla, and cerebellum show no gross pathological change apart from moderate congestion. The ventricular system is also symmetric and unremarkable. The base of the skull is intact without osseous abnormality.

## RIBS:

Intact.

## PELVIS:

Intact.

## VERTEBRAE:

Intact.

## BONE MARROW:

Unremarkable.

CASE NO. 1703729

## MICROSCOPIC EXAMINATION

Cassettes #1, #2 and #3 - Heart: Sections show a segmental small blood vessel disease with intimal hypertrophy in the high septum and focal interstitial and perivascular fibrosis.

Cassettes #4 and #5 - Right and left lungs, and adrenal glands: Sections show diffuse congestion and subpleural emphysematous changes with interstitial fibrosis. The adrenal glands are unremarkable.

Cassette #6 - Kidney, liver and parathyroid gland (x3): Sections show acute congestion; being otherwise unremarkable. There is a small focus of acute hemorrhages in the calyx, not specific.

Cassette #7 - Thyroid gland, kidney, left and pancreas: Sections show acute congestion.

Cassette #8 - Contusions of skin and scalp: Sections show acute hemorrhages with no acute inflammation.

September 13, 2017
CSC/kg

_____
CHAI S. CHOI, M.D.

6

**BOARD OF MEDICOLEGAL INVESTIGATIONS**

**OFFICE OF THE CHIEF MEDICAL EXAMINER**

901 N. Stonewall
Oklahoma City, OK 73117

**REPORT OF LABORATORY ANALYSIS**

| OFFICE USE ONLY |
| --- |
| Re. _____  Co. _____ |
| I hereby certify that this is a true and correct copy of the original document.  Valid only when copy bear im-print by the office seal. |
| By _____ |
| Date _____ |

ME CASE NUMBER: 1703729

DECEDENT'S NAME:   MAURICE  PENDLETON

MATERIAL SUBMITTED: BLOOD, VITREOUS, LIVER, BRAIN, GASTRIC, HOSPITAL SPECIMENS X 4

LABORATORY NUMBER:  173124

DATE RECEIVED:        07/20/2017

HOLD STATUS:  1 YEAR

SUBMITTED BY:    ASHLEY  WELCH

MEDICAL EXAMINER:   CHAI S. CHOI M.D.

---

**NOTES:**

**ETHYL ALCOHOL:**

   Blood:     NEGATIVE - (Hospital Specimen A)

   Vitreous:

   Other:

**CARBON MONOXIDE**

   Blood:

**TESTS PERFORMED:**

   ALKALINE DRUG SCREEN - (Heart Blood)
   ETHYLENE GLYCOL - (Hospital Blood B)
   EIA - (Hospital Serum C) - Amphetamine, Methamphetamine, Fentanyl, Cocaine, Opiates, PCP, Barbiturates, Benzodiazepines
      (The EIA panel does not detect Oxycodone, Methadone, Lorazepam or Clonazepam)

**RESULTS:**

   NONE DETECTED

09/06/2017
DATE

*Byron Curtis Ph.D.*

BYRON CURTIS, PH.D., F-ABFT, Chief Forensic Toxicologist



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**By Electronic and First Class Mail**

Commissioner Willa Johnson
Commissioner Brent Rinehart          **JUL 3 1 2008**
Commissioner Ray Vaughn
County of Oklahoma
320 Robert S. Kerr
Suite 505
Oklahoma City, OK  73102

　　　Re:  Investigation of the Oklahoma County Jail
　　　　　and Jail Annex, Oklahoma City, Oklahoma

Dear Commissioners:

　　　We notified you of our intent to investigate conditions at
the Oklahoma County Jail and Jail Annex ("Jail") in Oklahoma
City, Oklahoma, pursuant to the Civil Rights of Institutionalized
Persons Act ("CRIPA"), 42 U.S.C. § 1997 on February 8, 2003.
Consistent with our statutory requirements, we write to report
the findings of our investigation and to recommend remedial
measures to ensure that conditions at the Jail meet federal
constitutional requirements.  See 42 U.S.C. § 1997b.

　　　Since we initiated this investigation, we have toured the
Jail on several occasions, specifically, on May 28-30, June 9-13,
and August 27-29, 2003.  Our most recent tour of the Jail was on
April 25-27, 2007.[1]  This letter reports on conditions identified
on our most recent tour during which we inspected the Jail with
consultants in the fields of correctional practices and
standards, correctional health care, and environmental health
and safety.  While on-site, we interviewed administrative and

---

　　　[1]　　For a variety of reasons, several years elapsed between
the two tours.  Despite this opportunity to improve conditions
at the Jail, however, we generally did not observe improved
conditions at the time of the second tour.

**EXHIBIT 6**

-2-

security staff, health care providers, and detainees.[2]  Before,
during, and after our on-site inspections, we received and
reviewed a large number of documents, including policies and
procedures, incident reports, medical and mental health records,
and other materials.  Consistent with our commitment to provide
technical assistance and conduct a transparent investigation, we
provided extensive debriefings at the conclusion of our
inspections, during which our consultants provided their initial
impressions and concerns.

    We appreciate greatly the cooperation we received from
County and Jail officials throughout our investigation.  We also
wish to extend our appreciation to Sheriff John Whetsel, Major
Bobby Carson, and the staff and administration at the Jail for
their professional conduct and timely responses to our requests.

    Having completed the fact-finding portion of our
investigation, we conclude that certain conditions at the Jail
violate the constitutional rights of detainees confined there.
As detailed below, we find that the Jail fails to provide for
detainees':  (1) reasonable protection from harm;
(2) constitutionally-required mental health care services;
(3) adequate housing, sanitation and environmental protections;
and (4) protection from serious fire-safety risks.

I.    DESCRIPTION OF THE JAIL

    The main Jail facility, operated by the Sheriff's Office,
was built in 1991 and is located in downtown Oklahoma City.  It
is thirteen stories tall and was originally designed to hold
1,250 detainees, but held 2,543 detainees at the time of our
April 2007 tour.  The Jail has a daily detainee/booking of
approximately 125 detainees and an average annual
detainee/booking of approximately 44,000 detainees.[3]  The Jail
Annex, also located in Oklahoma City, occupies the top three
floors of the Oklahoma County Courthouse.  The Annex is used as

---

    [2]    The Jail houses mainly pre-trial detainees.  However,
the facility also houses some post-adjudication inmates.  For the
purpose of this letter, both groups will be referred to as
detainees.

    [3]    Administrative offices occupy part of the first floor.
The medical ward is located on the thirteenth floor.  A
recreation yard sits atop the roof of the building.  The
recreation yard is the only open-air part of the Jail accessible
by detainees.

-3-

a short-term holding facility for detainees who are awaiting court appearances in the Courthouse.  The Courthouse and Jail Annex were built in 1936.  Detainees are held at the Annex for short periods of time, usually half a day, while awaiting their court appearances.

The Jail contracts to house detainees from several jurisdictions, including the Oklahoma Department of Corrections, United States Marshals' Service, and the United States Immigration and Customs Enforcement.

## II.  LEGAL FRAMEWORK

CRIPA authorizes the Attorney General to investigate and take appropriate action to enforce the constitutional rights of jail detainees and detainees subject to a pattern or practice of unconstitutional conduct or conditions.  42 U.S.C. § 1997.  The rights of pre-trial detainees are protected under the Fourteenth Amendment which ensures that these detainees "retain at least those constitutional rights . . . enjoyed by convicted prisoners."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  See also Winton v. Board of Commissioners of Tulsa County, Oklahoma, 88 F.Supp. 2d 1247, 1256-8 (D.N.D. Okla. 2000) citing, Lopez v. LeMaster, 172 F.3rd 756, 759 n. 2 (10th Cir. 1999); Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir. 1985); and Barrie v. Grand County, Utah, 119 F.3rd 862, 867 (10th Cir. 1997).  Under the Eighth Amendment, prison officials have an affirmative duty to ensure that detainees receive adequate food, clothing, shelter, and medical care.  Farmer v. Brennan, 511 U.S. 825, 832 (1994); Bell, 441 U.S. at 535-36, 537 n.16.  Winton, 88 F.Supp. at 1256-8.  The Eighth Amendment protects prisoners not only from present and continuing harm, but also from future harm.  Helling v. McKinney, 509 U.S. 25, 33 (1993).  This standard has been adopted by the Tenth Circuit.

Detainees have a constitutional right to adequate medical and mental health care, including psychological and psychiatric services.  Farmer, 511 U.S. at 832; Board of Commissioners at 1257-8.  Detainees' Eighth Amendment rights are violated when prison officials exhibit deliberate indifference to their serious medical needs.  See Estelle v. Gamble, 429 U.S. 97, 102 (1976).  The standard for adequate medical and mental health care requires a showing of both the subjective and objective components of "deliberate indifference."  Deliberate indifference may be inferred when a prison official "knows of and disregards an excessive risk of detainee health."  Farmer, 511 U.S. at 837.

-4-

Detainee living conditions must be "reasonably sanitary and safe." Farmer 511 U.S. at 832; Ramos v. Lamm, 639 F.2d 559, 567 (10th Cir. 1980); Reece v. Gragg, 650 F.Supp. 1297, 1307 (D. Kansas, 1986). When plumbing, electrical and other physical plant deficiencies place detainees at the risk of harm from unhealthy conditions, relief may be warranted under the Constitution. See e.g. Reece, 650 F.Supp. at 1303-1304.

## III.   CONSTITUTIONAL DEFICIENCIES

### A.   Insufficient Protection from Harm

#### 1.   Inadequate Security and Supervision

Several factors make the Jail an unsafe environment for detainees and staff, and have resulted in serious harm to detainees.  The Jail houses over 2,500 detainees, nearly double its rated capacity.[4]  The facility, however, does not have sufficient bed space for this size population.  Throughout the facility, we found detainees sleeping on the floor and three or four detainees locked into two-man cells.  The detainees spend nearly 24-hours per day in these cramped quarters.

The large number of detainees, combined with the awkward physical layout of the Jail, makes providing adequate sight and sound supervision of detainees in their housing units extremely difficult.  In fact, actual direct supervision of detainees at the Jail is virtually non-existent.  The facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety.  Indeed, frequent fights or altercations which occur in the cell areas are often the result of inadequate housing unit supervision by Jail staff.

For example, while each housing unit or floor may house upwards of 500 detainees, there are often only one or two detention officers available to supervise the large number of detainees as well as to conduct detainee sight checks.  In addition, detention officers assigned to housing units must complete daily logs, conduct safety, sanitation, and security

---

[4]     While overcrowding at the Jail does not create a *per se* constitutional violation, the crowded conditions tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions.  For example, as will be further explained in this letter, the excessive number of detainees in close quarters contributes to issues such as increased violence among detainees and the grossly unsanitary condition of cells.

-5-

inspections, and respond to detainee needs.  These detention officers also are required to perform other duties that require them to leave the housing unit areas, including escorting detainees to:  the medical unit, attorney visits, visitations, court processing; religious programs, disciplinary and classification hearings, and, at limited times, exercise activities.  Accordingly, detention officers have little time to actually monitor detainees.

In addition, detainees are often left unsupervised for extended periods of time.  For example, our review of the Jails' Daily Staff Assignment and Inspection Reports for the month of April 2007 revealed that numerous housing unit security posts are not consistently staffed.  Staff and detainees also reported that sight checks for detainees are not conducted as frequently as needed.

The administration has installed surveillance cameras within many areas of the Jail, including the housing units, to help address the lack of detention officers.  However, blind spots exist within the housing units, such as in the showers and the inside of the cells, which cannot be monitored with cameras.

Compounding the lack of adequate detainee supervision within the housing units is the limited visibility into the individual cells.  Numerous cells are so dark due to detainees covering their cell windows and cell lights with paper towels, and other materials, that it is difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees.  The lack of adequate detention staff available to adequately supervise detainees exacerbates this problem.



---

⁵    We observed this problem during our first round of Jail tours in 2003.

⁶    Further, detainees have access to potentially dangerous items.  Detainees often tamper with cell doors using plastic utensils ("sporks") that they keep after meals.  These "sporks"

-6-



These examples reflect a major breakdown in security and could potentially result in serious harm to detainees or staff.

### 2. Inmate-on-Inmate Violence

There is an inordinately high risk of detainee-on-detainee violence at the Jail as a result of the Jail's chronic overcrowding, the staff's inability to supervise detainees, and the ability of detainees to bypass at will the security of their cell doors. Given all the other security issues discussed herein, the level of violence at the Jail is one of our most significant concerns. Such violence poses a serious risk of harm to both detainees and correctional staff at the Jail.

Regarding detainee-on-detainee assaults, during a two-month period shortly before our 2007 inspection, the Jail had approximately 70 detainee-on-detainee assaults. Some of these assaults resulted in death and/or serious injuries. Incident

_____

can also be used as weapons. Collecting these utensils after meals would reduce both security and sanitation problems ("sporks" were never intended for repeat use, since they cannot be properly washed or sanitized).

-7-

reports we reviewed about these events documented the following:

- At least two detainees were killed in these assaults.

- One detainee was stabbed during a fight.

- Another detainee received a fractured jaw during a fight.

- Yet another detainee had his eye lacerated during a fight, while a different detainee was stabbed in the eye during a fight.

We reviewed death records covering the years 2005 and 2006. From July 2005 to October 2006, four deaths at the Jail were the result of detainee-on-detainee assaults. The following is a summary of these deaths:

- In March 2006, a detainee died as the result of a dispute over commissary items. Detainees are allowed to purchase, and keep in their cells, large amounts of commissary items, usually foodstuff, which they barter.[7]

- Also, in May 2006, a detainee essentially beat to death his cell mate. The assault occurred in the cell block's dayroom area. In a Jail report we reviewed regarding the assault, a staff member noted "the alleged assailant was observed bragging about how he beat the crap out of" the victim. The victim had a history of mental health issues. The alleged assailant had a violent criminal history and had reportedly complained about the victim's behavior before the beating. After this incident, the assailant had yet another altercation in his cell with another detainee. Such factors typically warrant a careful review by security staff to ensure there was a proper security response. Yet it is not clear what review, if any, ever occurred.

- Another detainee died in November 2006 from injuries

---

[7]     As discussed in more detail in Section D, this situation also presents sanitation and fire safety issues as the material clutters already crowded cells. The food items attract vermin and the packaging provides a potential source of fuel for a fire.

-8-

sustained in an October 2006 assault.  The altercation reportedly began over a breakfast tray.  According to Jail documents we reviewed, the housing unit control center was not staffed at the time of the incident. The officer on duty was called to another area.

- In July 2005, while in a shared cell, a detainee assaulted another detainee in what jail documents describe as "a horrific and brutal" manner.  Following the assault, and after complaining to officers of a seizure, the victim was transported to a local medical center.  He died from cardiac arrest prior to reaching the hospital.

### 3.   Prevalence of Staff Use of Force

As described above, the Jail suffers from overcrowding and inadequate staffing.  As a result, Jail staff frequently resort to the use force to control events.  Although such uses of force are not *per se* inappropriate, between January 2006 and March 2007 there were 1,337 reported use of force incidents.  In the opinion of our expert, this is an inordinately high number of use of force incidents for a facility the size of the Jail.  Of these incidents, 504 involved some type of physical force, 105 involved the use of pepper spray (a chemical compound that irritates the eyes to cause pain, tears, and temporary blindness), 453 involved the use of handcuffs, 35 involved the use of rapid cuffs and 240 involved a planned use of force.  The majority of the emergency uses of force incidents, which involved the use of handcuffs or rapid cuffs, were needed as a result of detainee-on-detainee altercations.  Most of the planned uses of force were the result of intervention on a detainee who was harming himself.  The fact that a detainee was harming himself to the point where staff were forced to intervene may also indicate a lack of needed mental health treatment for these detainees.  Mental health services will be discussed in detail later in this letter.

Additionally, during the tour we reviewed eight video-taped use of force incidents.  These incidents involved the use of a restraint chair or four-point restraints (the practice of binding a detainee to a bed by the wrists and ankles).  In these instances, intervention was initially required due to the detainees' behaviors.  However, we often noted that, by the time the detainees were restrained in the restraint chair or four-point restraints, the detainee was no longer resisting and was compliant to staff orders.  As a result, it is the opinion of our expert that the restraint use was excessive and beyond the need to control the detainee.

-9-

In summary, we believe a number of factors combine to create a dangerous situation at the Jail. First, the lack of adequate detention staff presence within the living areas provides detainees with the opportunity to engage in illicit behavior, including detainee-on-detainee assaults and fights.[8]  Second, because detainees tend to be more volatile when living in overcrowded conditions, the likelihood of fights and assaults between detainees becomes greater. Third, there appears to be little interaction between detention officers and detainees, again, due largely to the lack of staff.

4.  Inadequate Disciplinary and Classification Processes

a.  deficient administration of detainee discipline

The Jail has a comprehensive policy and procedure governing detainee discipline. While the disciplinary process generally works well and appears to be administered in a fair manner, two aspects of the system that are not functioning adequately are putting detainees at risk and undermining the Jail's ability to effectively control inmate conduct. First, the lack of sufficient disciplinary segregation space at the Jail prevents appropriate separation of detainees who have committed infractions that require disciplinary segregation. The Jail has dedicated 25 cells on the 12th floor for this purpose. However, these cells are also used for administrative segregation of detainees. Twenty-five cells is inadequate considering the large number of detainees who are housed at the facility and the numerous infractions that occur routinely. According to generally accepted standards of practice, seven to 10 percent of the Jail's 1,200 cells should be reserved for special management purposes. Due to an insufficient number of disciplinary cells, the Jail maintains a constant "waiting list" of detainees who have committed various disciplinary infractions that warrant segregated status, but yet who remain in general population and await sanction. The Jail tries to prioritize the more serious offenses for disciplinary segregation. However, during our 2007 visit to the Jail, there were 16 detainees in general population waiting to be transferred to a disciplinary cell to serve their disciplinary sanction. At times, in order to make room for more urgent separation needs, detention staff are forced to let a

---

[8]     We also note that more Jail staff would also allow detainees greater out-of-cell time, which is currently extremely limited, and would assist in reducing tension among detainees.

-10-

detainee out of a disciplinary cell and back to a general population setting prior to serving his or her full disciplinary sanction.

Serious negative consequences have resulted from this lack of disciplinary cells.  Detainees are aware of the problem and the use of disciplinary cells as a deterrent to bad behavior is seriously compromised because the detainee may never have to serve his or her disciplinary sanction.  Further, even if a detainee does serve the sanction, it may be very long after the occurrence of the incident and with limited effect.  This is unacceptable correctional practice.  Generally accepted professional standards require an effective disciplinary system and the means for separating detainees who may be particularly dangerous or disruptive.  However, the limited number of disciplinary segregation cells thwarts the implementation of sound correctional practice at the Jail.

In addition to the insufficient cells for use in disciplinary segregation, the Jail staff fails to utilize the existing cells in an appropriate manner.  Generally accepted correctional principles require that detainees on disciplinary segregation be housed alone in a cell.  The Jail staff routinely place two detainees who are serving disciplinary time in a single cell.  This often leads to further disciplinary issues because many detainees serving a disciplinary sanction usually have committed an act of violence, aggression, or other serious infraction.  Segregation is intended to punish transgressors and protect other detainees.  Placing two detainees in a segregation cell defeats both purposes.

b.    ineffective classification of detainees

Further, although the Jail's classification system appears to be operating in terms of process, it is compromised by the overcrowded conditions at the facility.  The Jail does not have enough available cells to match the classification level of the detainees in a way that meets accepted standards of correctional practice.  For example, detainees are being triple-celled and in some cases, quadrupled-celled, in order to meet the required classification status and housing.

Notwithstanding that the Jail has adequate policies and procedures for classifying detainees according to their risks and needs, the overcrowded conditions at the Jail make it impossible to cell detainees consistently according to their classification. Thus, detainees are put at risk because the Jail cannot

-11-

adequately separate known potentially vulnerable detainees from
more aggressive detainees.

Similarly, the lack of sufficient staffing impacts the
Jail's ability to implement policies and procedures governing
other Jail operational matters.  These policies may be adequate
in writing, but cannot be adequately implemented.  For instance,
no matter how professional the staff, their frequent absence from
housing units means that they cannot fully implement standard
procedures on housing supervision; nor can they properly monitor
detainees for inappropriate conduct.

### 5.   Deficient Suicide Prevention

Our review of the investigations involving completed
suicides and suicide attempts revealed the Jail's failure to
respond adequately to issues that could help mitigate the success
of these activities.  For example, in the post-incident
investigation of a March 2006 suicide attempt of a detainee, the
Jail noted the following issues:  the responding officer's radio
battery was dead; the housing unit control center was not manned;
there was not a correctional officer in the pod to provide sight
and sound observation of detainees; the location of the
responding officer was unclear; the victim's cell mate estimated
that it took at least five to 10 minutes for an officer to
respond to his calls for assistance; and there was a further
delay in getting emergency medical services to the cell area.
Ultimately, the victim survived the attempt but suffered severe
brain damage.

Many of these same issues were present when a detainee
killed himself, apparently with tampered razor blades, while in
protective custody in June 2006.  The investigative report
describes the scene this way:

> The area between the bunk and desk contained pooled
> blood ... Blood had been dripped or smeared on every
> wall of the cell.  The sink was bloody and the water in
> the commode was dark red with blood ... The deceased
> had blood smears over a significant portion of his body
> ..."

At the scene, investigators found a razor blade that had
been removed from a safety razor.  The Jail's investigation and
response failed to address whether or not there were a sufficient
number of officers assigned to the unit or whether appropriate
sight checks were done on this protective custody detainee.

-12-

Other detainees have attempted suicide using razors at the
Jail.  Four months earlier, in January 2006, a detainee attempted
suicide by cutting himself with a razor blade.  This individual
survived but lost a large amount of blood.  There was apparently
no floor officer available at the time of the incident.  The
detainee's cell window had been covered, obscuring supervision of
the cell.  Also, 30 disposable razors were found in the
detainee's cell.  Three months later, yet another detainee had to
be treated at an outside hospital for injuries he sustained by
cutting himself with a razor in a suicide attempt.

We also noted that detainees have access to other hazardous
items.  We noted circumstances where detainees in the general
population had stockpiled materials in their cells, such as
shoestrings and laundry lines, that could be used by detainees to
hang themselves.

During our inspection, it was also clear that housing
facilities for suicidal detainees do not include necessary safety
features.  For instance, cells have ventilation grilles and other
fixtures that have not been modified to minimize the risk that
they may be used by an detainee to facilitate a suicide attempt.
Further, juvenile cells are particularly troubling, because they
are painted dark colors, making visibility of the inside of the
cell difficult.  The bunks are affixed in a manner that makes it
possible for a juvenile to tie a ligature to the structure in
order to commit suicide.

The foregoing factors further reinforce our general concerns
about breakdowns in Jail security and detainee safety.  They
severely undermine the Jail's efforts to conduct adequate
detainee sight checks, to control dangerous items such as razor
blades, and to ensure adequate officer coverage of detainee
living areas.

### 6.   Inadequate Investigation of Serious Events

Investigative reports of serious events involving detainees
are crucial to a jail administration in identifying, and
responding to, potential systemic problems.  While the Jail does
have an investigatory process, that process is often inadequate
to prevent an adequate understanding of the causes leading to an
event, or to implement measures to prevent future, similar
events.  In some instances the investigative reports prepared by
the Jail's Investigations Unit lack the detail that would
identify operational problems associated with serious events,
such as a detainee death or a use of force incident.  The Jail

-13-

lacks a formal process for reviewing even detainee deaths for operational breakdowns.

Additionally, the Jail does not capture, review, or analyze information about critical incidents in a systematic and formal fashion. Indeed, even when investigative reports addressed operational issues they are of minimal value because the Jail administrator and the command staff do not have access to them. Only the Sheriff and Under Sheriff, who are removed from the day-to-day operations of the facility, review the reports. The Jail administrator and the command staff should formally review and critique all serious incidents in order to address any noted deficiencies that may arise from the investigations. We received no evidence that trend information from these reviews is shared with the Jail's operations staff.

B.   Inadequate Health Care Services

1.   Inadequate Access to Medical Care

Access to medical care is a fundamental right retained by detainees in the Jails. Farmer, 511 U.S. at 832; Board of Commissioners at 1257-8; See also Estelle v. Gamble, 429 U.S. 97, 102 (1976). During our tour of the Jail, we uncovered instances where detainees were not provided adequate access to medical care, specifically acute services - with dire results.

While the Jail has a sick call system for detainees to access routine medical care services, detainees' serious medical needs are not adequately met.

The facility does not adequately screen detainees for serious medical problems. Our review of 45 health records indicates that the facility does not consistently provide 14-day health assessment required by generally accepted correctional medical standards. Such health assessments are important for identifying serious health needs and improves the facility's ability to provide adequate medical and mental health care to detainees. For instance, such screenings allow medical staff to physically examine detainees for communicable diseases, such as tuberculosis ("TB"),[9] and determine a detainee's medical and mental health history.

---

[9]   TB is a potentially life-threatening disease commonly found in correctional facilities.

-14-

The Jail also has had some problems providing appropriate access to medical care during emergencies.  In a particularly disturbing incident in July 2005, a female detainee gave birth to a three-month premature baby while in a wheelchair and handcuffed to a handrail outside the Jail's medical area.  From reports, it appeared the detainee was handcuffed to the rail from approximately 11:00 a.m. to 9:00 p.m.  She reportedly asked several times to be placed in a cell or some place where she could lay down.  The detainee had reportedly been yelling, cursing to be put back into her cell.  At about 8 p.m., the detainee was seen by mental health staff and was cleared from special precaution status.  Reportedly, the detainee later began yelling that her water had broken.  Medical staff examined the detainee and apparently assumed the discharge was from a bad infection.  She was handcuffed back to the handrail.  Shortly thereafter, the detainee was found laying on the ground in bloody water.  An officer reported observing the detainee place her hand down her pants and pull out the baby.  The baby was pronounced dead at a local hospital.  In our expert's opinion, this woman's care was "unconscionable" during the hours she was in critical need of access to medical care.

As noted earlier, when we reviewed the suicides at the Jail, Jail reports indicated there had been critical lapses in getting emergency medical care to detainees.  For example, as described at page 12 of this letter, when responding to finding a detainee hanging in his cell, the officer's radio failed to work, resulting in a delay in accessing emergency medical services. By the time the detainee reached a local hospital, a hospital doctor estimated the detainee had been without oxygen for 20 to 30 minutes and suffered severe brain damage as a result.

### 2.   Inadequate Mental Health Care

Jail officials violate the Constitution when they exhibit deliberate indifference to detainees' serious mental health needs.  States have a constitutional duty to provide necessary medical care to their detainees, including mental health care such as psychological or psychiatric care.  Riddle v. Mondragon, 83 F.3rd 1197, 1202 (10th Cir. (N.M.) 1996); citing Ramos v. Lamm, 639 F.2d 559, 574 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed. 2d 239 (1981).  When prison officials are deliberately indifferent to a detainee's serious medical needs, they violate the detainee's right to be free from cruel and unusual punishment.  Estelle, 429 U.S. 97, at 104. "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a

-15-

doctor's attention.'" <u>Riddle</u> at 1202, citing <u>Ramos</u>, 639 F.2d at 575.

Other than medicating detainees with Thorazine (which is an older anti-psychotic medication with serious potential side-effects), the Jail offers essentially no mental health services to its seriously mentally ill. As we walked through the Jail, we saw numerous detainees who were obviously suffering from mental illness and in need of psychiatric care and treatment. Yet, many of these detainees appeared to be essentially untreated. Clearly, these detainees required more treatment modalities than they were receiving.

It is quite likely that detainees' mental illness played a part in two of the four deaths described earlier in this letter. For example, in the October/November 2006 death, both the aggressor and victim had mental health problems. The victim had been in psychiatric restraints for agitated yelling and cursing at unknown objects. The assailant had documented psychiatric problems and episodes just days before the incident. A nurse's note at the time indicates that other detainees and security staff had voiced concerns regarding the victim who had been stealing food, going through old eaten trays for food, and was exhibiting manic behavior with some delusions. Jail staff stated the detainee's behavior was "likely to cause him to be harmed by others." Earlier that year, the detainee told the nurse that he had been attacking his cell mates. He also told staff he believed his cell mates were plotting against him and stealing his food. Finally, he informed staff that if he returned to his cell he would hurt himself.

Another major reason the Jail fails to provide adequate psychiatric service is the lack of adequate mental health staff at the Jail. There is only one full-time psychiatrist serving the Jail. During our tour, we received conflicting information about the number of detainees on anti-psychotic medications, but it appeared that at least nine to 10 percent of the detainees were taking these medications. Accordingly, the Jail should have approximately 250 detainees taking anti-psychotic medications. According to the American Psychiatric Association guidelines, the recommended staffing for psychiatrists in jails is one-full time psychiatrist for every 75 to 100 detainees with serious mental illness who are receiving psychotropic medication. Thus, the Jail has less than half the recommended number of psychiatrists serving its detainees.

The Jail's mortality review of the detainee who was killed in May 2006 revealed the detainee also suffered from a

-16-

psychiatric illness, possibly early dementia.  Appropriate mental
health therapies might have helped mitigate this situation by
ameliorating the detainee's psychosis-related behaviors that led
him to be the target of other detainees' violent assaults.

Further, and as noted previously, the use of restraints is
also problematic at the Jail because it is used in lieu of
treatment.  This is especially true given the large number of
mentally ill detainees in the Jail and the fact that such
under-or-untreated detainees often engage in inappropriate
conduct as the result of psychosis-rated behavior.

### 3. Inadequate Treatment and Management of Communicable Disease

The Jail fails to adequately treat and manage communicable
diseases.  The Jail's management of TB[10], Methicillin Resistant
Staphylococcus Aureus ("MRSA"),[11] and other infectious diseases
deviates substantially from generally accepted correctional
medical practices.  A significant problem at the Jail is that the
Jail does not have adequate systems in place to ensure that these
serious public health issues are identified and monitored
adequately.  For example, Jail records conflicted on the number
of MRSA cases present at the Jail.  Documents identified from
zero to 22 cases 2006.  Jail staff were unable to account for the
differences in the Jail's own records.

The same unreliable data was present regarding the
identification and monitoring of detainees with TB.  Jail data
reported there were 21 cases of TB at the Jail in 2006.  Of these
21 cases, Jail records showed 16 cases happened in a single month:
November.  Such an occurrence is highly unlikely and raises
serious questions about the Jail's system for collecting,
monitoring, and recording TB data.  According to our expert

---

[10]   The transmittal of TB can be prevented or controlled
with an appropriate TB control plan.  A TB control plan provides
guidelines for identification, treatment, and prevention of
transmission of TB to staff, the public, and uninfected
detainees.

[11]   MRSA are drug-resistant bacteria that can cause
life-threatening illness such as pneumonia, and skin, bone, and
bloodstream infections.  MRSA is particularly prevalent and
virulent in institutions, where many people are housed in close
proximity and where basic hygiene may be lacking.

-17-

physician, "these flaws and lack of knowledge regarding the data reported raise credibility and effectivity concerns with respect to the Jail's entire Communicable Disease Management and Infection Control Program."

C.   Deficient Housing, Sanitation and Environmental Protections

1.   Inadequate Detainee Housing

As noted earlier, because of the overcrowding at the Jail, most detainees have very little living space.  Detainees sleep under tables, next to toilets, and underneath bunk beds. Detainees are crowded into small cells with little outdoor or even dayroom time.  Some detainees have even signed requests not to have a cot because there is no room in their cells for a cot. These cramped conditions breed inadequate sanitation.

In addition, the cells also are unsanitary because of detainees hoarding commissary items.  Detainees may order $150 per week of commissary items.  As noted earlier, as a result of detainees purchasing food products, cells are filled with litter, inviting vermin infestation, and exacerbating the risk of the spread of infectious diseases, which are already prominent in the Jail.  Cells (as noted above) are also rife with suicide hazards.

Conditions at the Annex are also unsanitary.  Although the detainees may only spend part of a day in the Annex, the conditions in the facility create the risk of transmission of infectious disease.  Detainees have no soap in the cells to wash their hands.  Further, the toilet and drinking faucets are small units with the faucet and basin just above the uncovered, foul smelling, filthy commode stool.  If a detainee needs water, the detainee has to cup his hand under the faucet and lap water from his hands close above the filth of the toilet bowl.

2.   Inadequate Maintenance of the Jail's Physical Plant

The Jail has a new maintenance system which allows for automated work orders to be generated, but many orders are not being filled due to poor follow-up.  We found a number of inoperative showers, leaking bathroom fixtures, inadequate water temperatures, and other unsanitary conditions that had not been corrected for an obviously lengthy period of time.  For instance, the water temperature is inadequate to allow detainees to clean themselves appropriately.  Shower fixtures were also broken. Given the size of the detainee population, the loss of basic hygiene facilities creates unnecessary health hazards.

-18-

Additionally, because hygiene facilities are in common areas, the near-total lockdown status of the Jail means that detainees often cannot shower for days at a time.

Lack of adequate preventative maintenance was also a major issue at the Annex. Cells were dark and unclean. Cell walls were covered with old and chipped paint to the point where the walls could no longer be sanitized. Toilets were filthy and lacked toilet paper. Sinks had no hot water. Again, with detainees crowded into cells, these such conditions create an environment that fosters the spread of disease and infection, placing both detainees and staff at risk.

### 3. Unsanitary Food Service Protections

The Jail serves between approximately 7,500 and 8,000 meals daily. This includes approximately 150 "special diet" meals for detainees requiring diets in conformance with religious beliefs or for detainees receiving medically-required special diets for chronic illnesses, such as diabetes or high cholesterol.[12] While recent renovations at the kitchen have resulted in a modern facility, we noted some deficiencies with food preparation, storage, and handling, which creates a substantial risk of foodborne illness. Further, only one of the food service managers is certified. This can impact upon the adequacy of supervision of the food service operation.

We also observed damaged kitchen equipment and inadequate dishwashing and sanitization practices. For example, during the tour, we saw numerous food trays encrusted with what appeared to be mold and food even after they had gone through the cleaning process. These situations pose a health threat as this potentially allows for growth and spread of bacteria.

We also noted other hazardous issues regarding the Jail food preparations services, including: the lack of hot water for sanitary hand washing; bird and insects getting into areas where food was prepared; inadequate dishwashing practices; and inadequate access to safe drinking water. These factors combine to produce an unhealthy and unsafe environment for detainees as well as for staff who must work in these conditions.

### 4. Inadequate Pest Control

---

[12]   Food service also prepares bologna sandwiches for detainees transferred to the Annex to await court appearances.

-19-

The Jail receives pest control service monthly throughout the facility and in the food service area, and officers and kitchen staff are also able to file work orders for pest issues through the maintenance work order system. When such requests are made, the exterminator is given the list of work orders for necessary follow up. Despite this system, we observed gnat infestation around some showers and garbage containers; gnats can carry germs and diseases and can pose the risk of infecting detainees and staff. Similarly, the Jail also needs to control the amount of food detainees collect in their cells. Large amounts of food in areas that are not properly cleaned, such as the jail cells, can lead to bug and insect infestations. We also observed vermin coming out of drains; a problem that could be eliminated with improved bathroom cleaning.

As noted above, birds fly and roost in the food service area. We also observed that the door from the food service area to the outside has a large gap that allows birds and insects to enter the kitchen from the loading area. This presents a serious danger as birds can carry and transmit diseases.

### 5. Inadequate Laundry Services

The Jail's laundry operation is not adequate to keep pace with the needs of the detainee population. Generally accepted sanitation standards require routine laundering and cleaning, using appropriate detergent and disinfectant, to prevent the spread of disease causing bacteria, viruses, and insects such as lice. Clothing exchange, including underwear, only occurs once a week. Professional standards dictate that such an exchange take place two to three times per week. Detainees frequently launder their clothing in their cells' toilets or sinks, putting up laundry lines and hanging clothes over apertures. As noted earlier, this practice results in unsanitary conditions and security hazards (e.g., suicide risks). Given the Jail's living conditions and the risks associated with infrequent laundering of detainee clothing, the Jail should consider more frequent clothing exchanges to lessen public health and disease risks.

### D. Dangerous Life and Fire Safety Deficiencies

Given the size of the Jail population and significant gaps in supervision, fire safety is a grave concern for this Jail. We found serious problems with fire safety training, policies, and safety equipment. Both staff and detainees are in serious jeopardy of injury or death during a fire emergency.

-20-

First, fire safety drills are problematic at both the main Jail and the Annex. At the main Jail, records indicate that most of the staff have had problems recalling appropriate fire evacuation procedures. When we conducted a mock evacuation at the Annex, we were told by staff that "they have never had a fire drill in recent memory." More disturbing, the convoluted Annex evacuation route turned out to be barred by a locked gate, and staff had difficulty finding the key. Should a fire or other emergency occur, such delays could result in serious loss of life.

Second, emergency evacuation routes are not clearly posted in the Jail. This can be catastrophic in a facility that may have to evacuate a large detainee population with very few staff.

Third, fire safety devices are inadequate. The Jail's self-contained breathing apparatuses are not properly secured to prevent tampering and damage. The Annex evacuation route is the only route out of the facility, but because of the age of the building, sprinklers and other safety devices are not present.

The fire safety deficiencies at the Jail are serious enough that we believe careful consideration needs to be given to taking immediate remedial action. The Sheriff's Department also needs to carefully consider whether the Annex can be safely used at all to house detainees.

## IV. RECOMMENDED REMEDIAL MEASURES

In order to address the constitutional deficiencies identified above and protect the constitutional rights of detainees, the Jail should implement, at a minimum, the following measures in accordance with generally accepted professional standards of correctional practice:

1. The Jail should ensure that there are a sufficient number of adequately trained staff on duty to supervise detainees and respond to serious incidents in a manner consistent with generally accepted standards.

2. The Jail should implement policies and procedures to allow adequate supervision of detainees. This should included conducting adequate staff rounds in all housing areas, visually inspecting inmate cells, searching facilities for contraband, and promptly responding to medical and other emergencies.

3. The Jail should repair and maintain the Jail's physical security features, including cell locks and doors, in

-21-

order to reduce the risk of violence and Jail disturbances.

4.  The Jail should develop and implement an objective classification system consistent with generally accepted correctional standards. This system should ensure that inmates are separated based on appropriate security factors, including disciplinary status and history of violence. Detainees should be placed and supervised in housing facilities that are appropriate for their classification status.

5.  The Jail should develop and implement incident investigation, quality assurance and improvement processes that identify areas requiring improvement, prioritize reform efforts, and assist in development of appropriate remedies.

6.  The Jail should ensure the timely assessment, identification and treatment of detainees' medical and mental health care needs. Specifically, the Jail should:

    a.  Provide adequate medical intake procedures;

    b.  Ensure that qualified medical staff screen detainees properly for serious medical and mental conditions;

    c.  Provide timely and appropriate treatment for detainees with serious medical and mental health conditions;

    d.  Ensure that detainees with chronic diseases receive screening, testing, treatment, and continuity of care;

    e.  Develop and implement a communicable disease plan that allows proper identification, tracking, treatment, and management of communicable diseases;

    f.  Provide medications, including psychotropic medications, in a timely manner. Treatment, including mental health treatment, needs to be tailored to the inmate diagnoses and individual medical needs;

    g.  Maintain complete and accurate medical records in

-22-

an organized and readily accessible manner. Physicians and psychiatrists need to periodically review medical orders and monitor medication use;

h.   Develop and implement procedures to allow timely mental health and other specialized care for inmates referred for such care by medical staff. These procedures should include mechanisms to obtain medical documents and orders from the outside medical providers.

i.   Provide medical and mental health staffing sufficient to meet detainees' serious medical and mental health needs. This includes staffing to provide timely health assessments, mental health evaluations, medical care, and mental health crisis and in-patient care.

7.   The Jail should develop and implement policies and procedures to ensure adequate cleaning and maintenance of facilities. This should include mechanisms for meaningful facility inspections, documentation, prompt repair of damaged plumbing and other fixtures, and a regular maintenance process.

8.   The Jail should provide inmates with clean clothing and linens and should implement adequate sanitary laundry procedures.

9.   The Jail should ensure that food services are provided with and proper sanitation and hygiene to minimize the risk of food contamination and illness. Kitchen staff should be trained on food safety and proper food handling.

10.  The Jail should develop and implement pest and vermin control procedures in accordance with generally accepted health standards.

11.  The Jail should provide adequate fire safety consistent with generally accepted standards. More specifically:

a.   The Jail should ensure that inmate housing areas meet generally accepted minimum standards of life safety. To that end, all inmate housing areas, including those at the Annex, should have adequate fire safety features, such as functioning fire alarms and evacuation routes, and adequate numbers

-23-

of hygiene facilities, including properly
maintained wash basins and toilets.

b.   The Jail should ensure that fire and life safety
equipment, including communications gear, is
functional and properly maintained.  Staff should
be trained on such equipment.

c.   The Jail should regularly train and drill staff on
fire and emergency procedures;

d.   The Jail should development and implement policies
and procedures to ensure adequate control of fire
and safety hazards such as chemical supplies,
razors, and materials that can contribute to
excessive fire loading.

* * * * * * * * * * * * * * * *

Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website.  While
we will provide a copy of this letter to any individual or entity
upon request, as a matter of courtesy, we will not post this
letter on the Civil Rights Division's website until ten calendar
days from the date of this letter.

We hope to continue working with the County in an amicable
and cooperative fashion to resolve our outstanding concerns
regarding the Jail.  Assuming there is a spirit of cooperation
from the County and the Jail, we also would be willing to send our
consultants' evaluations under separate cover.  These reports are
not public documents.  Although the consultants' evaluations and
work do not necessarily reflect the official conclusions of the
Department of Justice, their observations, analysis, and
recommendations provide further elaboration of the issues
discussed in this letter and offer practical technical assistance
in addressing them.

We are obligated to advise you that, in the entirely
unexpected event that we are unable to reach a resolution
regarding our concerns, the Attorney General may initiate a
lawsuit pursuant to CRIPA to correct deficiencies of the kind
identified in this letter 49 days after appropriate officials have
been notified of them.  42 U.S.C. § 1997b(a)(1).

We would prefer, however, to resolve this matter by working
cooperatively with you and are confident that we will be able to

-24-

do so in this case.  The lawyers assigned to this investigation will be contacting the County's attorney to discuss this matter in further detail.  If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

/s Grace Chung Becker

Grace Chung Becker
Acting Assistant Attorney General

cc:  David Prater, Esq.
     Oklahoma County District Attorney

     John Whetsel
     Sheriff
     Oklahoma County

     John C. Richter, Esq.
     United States' Attorney
     Western District of Oklahoma

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE UNITED STATES AND
## OKLAHOMA COUNTY, OKLAHOMA

This Memorandum of Understanding (MOU) is entered into by the United States and Oklahoma County, Oklahoma (County) to address the United States' investigation into conditions at the Oklahoma County Jail and Annex (Jail), pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997.

On April 8, 2003, the United States notified Oklahoma County officials of its intention to investigate conditions at the Jail, pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997.

On July 31, 2008, the United States issued a findings letter pursuant to 42 U.S.C. § 1997. The County cooperated with the United States and agreed to implement recommended remedial measures at the Jail. The findings letter was not issued with any intention of creating, modifying, or compromising the rights of the County or any third party.

No person or entity is intended to be a third-party beneficiary of this MOU for purposes of any civil, criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this MOU. This MOU is not intended to impair or expand the right of any person or entity to seek relief against the County or its officials, employees, or agents, for their conduct. This Agreement is not intended to alter legal standards governing any such claims.

The County of Oklahoma County, the Board of County Commissioners and the Sheriff acknowledge the concerns of the Department of Justice as outlined in this MOU. However, it is Oklahoma County's contention that substantial progress has been made on conditions at the Oklahoma County Detention Center since those conditions were alleged in the Department of Justice's letter of July 31, 2008. The parties acknowledge that to fully implement this MOU,

1



EXHIBIT 7

funding will need to be obtained to hire additional staff and to remodel or replace the existing Jail.   Irrespective of the approval of funding, the County of Oklahoma County agrees to meet its constitutional obligations.

By agreeing to sign this MOU, the County of Oklahoma County does not admit to, or confess to any violation of United States constitutional or statutory law, or Oklahoma constitutional or statutory law; nor does the County of Oklahoma County admit to, or confess, to any violation any federal or state statutory law as a result of the Department of Justice's Findings Letter of July 31, 2008.

## TABLE OF CONTENTS

I.      DEFINITIONS ...................................................................................................4

II.     BACKGROUND ...............................................................................................6

III.    CORRECTIONAL ISSUES ..............................................................................7

        A.      Detainee Safety and Supervision ...............................................7

        B.      Staff Training ...........................................................................11

IV.     Medical and Mental Health Care ...................................................................12

        A.      General Provisions ...................................................................12

        B.      Medical and Mental Health Staff and Training  ......................13

        C.      Screenings and Assessments ....................................................14

        D.      Access to Treatment ................................................................16

        E.      Medication ...............................................................................19

        F.      Mental Health Care ..................................................................20

V.      SUICIDE PREVENTION.................................................................................21

VI.     ENVIRONMENTAL HEALTH AND SAFETY ...............................................24

        A.      General sanitation  ...................................................................24

        B.      Fire safety ................................................................................26

VII.    QUALITY ASSURANCE ................................................................................28

VIII.   CONSTITUTIONALLY SOUND FACILITY....................................................29

IX.     COMPLIANCE, REPORTING, AND DOJ MONITORING ............................29

        A.      Substantial Compliance ...........................................................29

        B.      Compliance Reporting ..............................................................30

        C.      Compliance Monitoring ...........................................................31

        D.      General Provisions ...................................................................31

X.      TERMINATION ..............................................................................................32

XI.     MODIFICATION .............................................................................................. 34

3

I.    **DEFINITIONS**

A.    "United States" shall refer to the United States of America.

B.    "DOJ" shall refer to the United States Department of Justice, which represents the United States in this matter.

C.    "The County" shall refer collectively to Oklahoma County, Oklahoma, the Sheriff of Oklahoma County, in his official capacity, the members of the Oklahoma County Board of Commissioners, in their official capacity, and their agents and successors in office.

D.    "Sheriff" shall refer to the Sheriff of Oklahoma County.

E.    "Jailer" shall be construed to mean any County or Jail employee, irrespective of job title, whose regular duties include the supervision of inmates in the Jail.

F.    "Board of Commissioners" shall refer to the Oklahoma County Board of Commissioners.

G.    "Oklahoma County Jail" (Jail) includes the existing Jail facility, the facility known as the "Annex" as well as any other Oklahoma County institutions built, leased, or otherwise used, to replace the current Jail or Jail components.

H.    "Detainee" or "Detainees" shall be construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at either the existing Jail or any institution that is built or used to replace the Jail or any part of the Jail.

I.    "Qualified staff" or "qualified professional" shall refer to an individual qualified to render the requisite and appropriate care, treatment, judgment(s), training and service, based on credentials recognized in the specific field.

J.    Consistent with, or in accordance with, the term "generally accepted correctional standards of care" shall mean a decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment,

4

practice, or standards as to demonstrate that the person responsible based the decision on such accepted professional judgment.

K.   "Quality assurance" means a system of self-audit and improvement to assess the implementation and effectiveness of all remedies instituted pursuant to this MOU, to identify deficits that may exist, and to effectuate new measures to cure deficits identified.

L.   "Substantial compliance" indicates that the County has achieved compliance with most or all components of the relevant provision of the MOU.

M.   "Non-compliance" indicates that most or all of the components of the MOU provision have not yet been met.

N.   "Effective date" shall mean the date this MOU is signed by all the parties.

O.   "Includes" (or "including") shall mean to contain in whole in part and "but not limited to."

P.   "Remedial Plan" is the document titled "Information provided by the Oklahoma County Sheriff's Office for review by the United States Department of Justice Civil Rights Division Special Litigation Section."

Q.   "Provision" shall mean an entire substantive section of the MOU, e.g., "III.A Correctional Issues – 'Detainee Safety and Supervision' or "IV.B – Medical and Mental Health Staff and Training' " are each one provision.  Subparagraphs are not severable.

II.    **BACKGROUND**

A.    The Defendant, Oklahoma County, through the Board of Commissioners and Sheriff, owns, operates, and has responsibility for funding the Jail, located in Oklahoma County, Oklahoma.

B.    The Defendant Sheriff is responsible for the day-to-day operation of the Jail. In his official capacity the Sheriff has the custody, rule, and charge of the Jail and Jail Detainees.

III.   **CORRECTIONAL ISSUES**

A.   **Detainee Safety and Supervision**

    1.    <u>Qualified Staff</u>:  The County shall ensure that the Jail is operated and managed by adequate qualified staff.  The County shall hire sufficient numbers of qualified Jailers to operate the Jail safely and to carry out the requirements of this MOU.  In order to achieve this, the County shall:

        a.    Within six months the County shall undertake, in accordance with generally accepted professional standards, a staffing study to determine necessary staffing levels at the Jail.  Such study shall take into account all duties staff are required to perform (e.g., providing floor supervision, transport of detainees, regular rounds, conduct of shakedowns, immediate response to emergencies).  The Department of Justice acknowledges the County of Oklahoma County is undertaking such staffing study and the County will provide findings of such study to DOJ staff within the time limits herein.

        b.    Upon the completion of the study called for in Paragraph III.A.1.a above, should the study indicate additional staff is necessary, the County shall use the staffing study results as a guide to the development and implementation of a staffing plan that will include reasonable timetables for implementation of this MOU and for the hiring of any additional staff.  The Parties recognize this timetable may be impacted by the efforts needed by the County to seek additional funding to meet the required staffing levels.  However, failure to secure funding does not release the County from the duty to provide constitutional conditions at the Jail.  The Department of Justice is aware the County of Oklahoma County is intent on presenting a financing measure to the vote of the citizens of Oklahoma

7

County to reach the goal of this paragraph's directive. Whether or not sufficient funding is obtained, but without admitting any prior deficiencies, the County of Oklahoma County will provide constitutional living conditions for inmates and detainees at the Jail.

c. The County shall continue work on its development of a direct supervision system for the detention center which will include having at least one officer in each housing unit/pod. The parties acknowledge that this system can only be implemented with sufficient funding for additional staff, operational resources, and remodeling or replacement of existing housing facilities. In the meanwhile, the County shall ensure that there is at least one officer in each control room and at least one roving officer ("Rover") on the floor to patrol every two housing units or pods. If the County fails to timely implement this provision, the United States reserves the right to take an immediate and appropriate enforcement action. The Department of Justice acknowledges that the County of Oklahoma County cannot implement this provision until a financial measure is passed by vote of the citizens of Oklahoma County to provide a funding source for the hiring and retention of additional staff, and to fund construction or remodeling of the existing Jail. Without admitting prior deficiencies, the County of Oklahoma County will agree, however, that it is obliged to continue striving to provide adequate staffing and supervision of inmates and detainees in the Jail.

d. In the interim, the County shall evaluate, and implement, if there are alternatives currently available to increase Detainee supervision and safety including, but not necessarily limited to: increased video surveillance; more frequent rounds and shakedowns; increased use of diversion

8

programs; and contracting with other facilities to temporarily house County detainees.

e.    The County agrees to provide the DOJ with the results of the study and any and all documentation and information necessary to demonstrate that the County is moving forward in good faith and at reasonable pace to implement the requirements of Paragraph III.A.1 of this MOU.

2.    <u>Supervision and Rounds</u>:  Upon the effective date of this MOU the County shall promptly make all reasonable efforts to ensure that security staff conducts appropriate rounds with sufficient frequency to provide Detainees with adequate supervision and reasonable safety.  Rounds shall be conducted at least every thirty (30) minutes for high security and high risk inmates or detainees, such as those in mental health observation and segregation units.  Otherwise, rounds shall be conducted at least every sixty (60) minutes or more frequently based on generally accepted correctional standards.  More frequent rounds shall be conducted for Detainees requiring more intensive supervision for security and safety reasons. These rounds shall include logged, visual inspections of all housing areas.  Video surveillance may supplement, but must not be used to replace, rounds by Jailers. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

3.    <u>Jail Maintenance</u>:  The Jail shall maintain the physical plant of the facility, with special emphasis on cell door maintenance, in proper working order and in a manner than maintains appropriate security and safety for Jail staff and Detainees. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

9

4.    Monitoring Equipment:  The County shall maintain in working order all cameras, alarms, and other monitoring equipment at the Jail.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

5.    Classification:  The County shall maintain an appropriate classification system to protect Detainees from unreasonable risk of harm.  Detainees shall be timely classified and placed in housing appropriate for security and safety.  This system shall include consideration of a Detainee's security level, suicide risk, and past behavior.  The County shall use best efforts to take into account the Jail's census, anticipated periods of unusual intake volume, and "waiting list" issues to timely and appropriately classify Detainees.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

6.    Detainee Discipline:  The County shall ensure there are adequate policies, procedures and physical plant resources (e.g., segregation cells, adequate out-of-cell time for Detainees) in place to ensure the effective implementation of an adequate disciplinary system for Detainees.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

7.    Incident Reporting:  The County shall document all serious incidents involving Detainees, including suicides, suicide attempts, Detainee-on-Detainee violence, use of force by staff, fires, escapes, and deaths.  Such records shall be maintained and reviewed promptly and at regular intervals.  Reviews shall include a case-by-case review of individual incidents as well as a more systemic review in order to identify potential patterns of incidents.  The County shall incorporate such information into its quality assurance practices and take any necessary

corrective action needed to remedy identified deficiencies.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

8.    Investigations:  The County shall maintain internal investigation policies, procedures, and practices.  Where appropriate, the County shall implement remedies based upon the results of these internal investigations.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

9.    Use of Force Reviews:  The County shall develop and implement policies and procedures to ensure prompt supervisory and/or management review of all use of force incidents to determine whether - the use of force was appropriate; a referral should be made to a local law enforcement agency or district attorney for possible criminal action; remedial training is necessary; facility policies should be revised. Consistent with generally accepted standards, the level of investigation required will be based upon the severity of the force used.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

B.    **Staff Training**

10.    Training Regarding this MOU:  The County shall provide training and supervision to staff sufficient to implement the provisions of this MOU. Additionally, the County will provide an initial orientation for all new Jail employees on Jail policies, security procedures, and Detainee rights.  The County shall also develop a Jail training program that includes pre-service and annual in-service training for all staff.  Without admitting prior deficiencies, the County

11

of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

11.   Scope of Training:  Jail staff must all be trained and authorized to handle basic security functions.  Such functions include:  (a) providing general supervision of housing units; (b) dealing promptly with emergency situations; (c) conducting inspections of cell door functioning; (d) conducting cell searches; (e) opening cell doors; and (f) implementing Jail policy and procedures.  Jail staff must also be trained on the medical and mental health policies and procedures as detailed in Sections IV and V below.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

## IV.   MEDICAL AND MENTAL HEALTH CARE

### A.   General Provisions

12.   Standard:  The County shall ensure that services to address the serious medical and mental health needs of all Detainees meet generally accepted correctional standards of medical and mental health care.

13.   Policies and Procedures:  The County shall develop and implement medical and mental health care policies and procedures, including those involving intake, communicable disease screening, sick call, chronic disease management, acute care, infection control, infirmary care, and dental care.  All relevant staff shall have ready access to medical and mental health policies and procedures.

14.   Record keeping:  The County shall develop and implement a record-keeping system to ensure adequate and timely documentation of health care assessments and treatments, and ensure all relevant staff have adequate and timely access to such documents.  All medical records, including laboratory reports, shall be timely filed in the detainees' medical file.  The medical record shall be complete,

and, when possible, shall include information from prior Jail incarcerations. The County shall implement an adequate system for medical records management. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

**B.    Medical and Mental Health Staff and Training**

15.    Staffing:  The County shall maintain sufficient staffing levels of qualified medical staff and mental health professionals to provide adequate care for Detainees' serious medical and mental health needs.

16.    Health Services Administrator:  The County shall retain a qualified health care professional to serve as the Health Services Administrator (HSA) overseeing all day-to-day aspects of health care at the Jail.  The HSA's shall be responsible for coordinating health care services to ensure that Detainees receive adequate: (a) initial clinical screenings; (b) 14-day health assessments; (c) communicable disease screening; (d) medical and mental health sick call; (e) physician referrals; (f) mental health referrals; (g) timely emergency and specialty care, and admissions to local hospitals, when appropriate; and (h) chronic care.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

17.    Mental Health Administrator:  The County shall retain an adequately qualified mental health professional to serve at the Jail Mental Health Administrator (MHA).  The MHA shall be responsible for coordinating and delivering mental health services to Jail Detainees.  This individual shall be responsible for (a) ensuring Detainees have timely access to mental health care for serious needs; (b) ensuring that Jail mental health care complies with Jail policies and applicable

13

standards; and (c) evaluating and coordinating treatment for Detainees in response to mental health referrals from the HSA and other medical staff or providers. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

18. <u>Medical and Mental Health Staff Training</u>: The County shall ensure that all medical and mental health staff are adequately trained to meet the serious medical and mental health needs of Detainees. All such staff shall continue to receive documented orientation and in-service training in accordance with their job classifications, and training topics shall include suicide prevention and the identification and care of Detainees with mental health disorders. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

19. <u>Security Staff Health Care Training</u>: The County shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of Detainees with serious medical or mental health needs. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

C.   **Screening and Assessments**

20. <u>Intake Screening</u>: The County shall appropriately screen all Detainees upon arrival at the Jail to identify individuals with serious medical or mental health conditions, including - acute medical needs, infectious diseases, chronic conditions, physical disabilities, mental illness, suicide risk, and drug and/or alcohol withdrawal. Such screening shall be performed by an appropriately qualified mental health professional. Detainees who screen positively for any of

14

these items shall be referred for immediate or prioritized screening by the HSA or other qualified health care staff. Jailers supervising newly arrived Detainees shall physically observe the conduct and appearance of these Detainees to determine whether they have a more immediate need for medical or mental health attention prior to their initial health screenings. Qualified medical staff shall review the initial screening forms daily in order to identify serious medical care needs. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

21.  Initial Clinical Health Screening: The County shall provide for initial clinical health screening by the HSA, or other clinical staff sufficiently qualified to conduct such screening, for new Detainees and Detainees transferring from other correctional institutions within forty-eight (48) hours of each Detainee's arrival at the Jail. The County shall ensure that staff performing initial health screenings are trained and qualified to complete the assessments. For this initial health screening, clinical staff shall record and seek the Detainees' cooperation to provide - (a) medical, surgical, and mental health history, including current or recent medications; (b) current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use; (c) history of substance abuse and treatment; (d) pregnancy; (e) history and symptoms of communicable disease; (f) suicide risk history; and (g) history of mental health treatment, including medication and hospitalization. Jail staff shall attempt to elicit the amount, frequency, and time of the last dosage of medication from every Detainee reporting that he or she is currently or recently on medication, including psychotropic medication. The HSA shall consult routinely with the supervising physician, qualified mental health professionals, and other health care providers

as needed to ensure adequate treatment for Detainees' serious medical problems. This initial health screening information shall promptly become part of a Detainee's medical record. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

22.   Fourteen Day Health Assessment: Qualified medical staff shall perform full physical and mental health assessments for each Detainee within 14 days of a Detainee's arrival at the Jail. The assessment shall include - (a) a comprehensive medical history; (b) physical examination; (c) testing for tuberculosis and other relevant communicable diseases; (d) mental health history; and (e) current mental health status examination. Records documenting the assessments and results shall become part of each Detainee's medical record. A re-admitted Detainee (or a Detainee transferred from another facility), who has received a documented full health assessment within the previous three months and whose receiving screening shows no change in the Detainee's health status, need not receive a new full physical health assessment. For such Detainees, qualified personnel shall review prior records and update tests and examinations as needed. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

23.   Screening, Testing and Treatment of Communicable Diseases: The County shall develop and implement a policy for communicable disease screening, testing, and treatment. The communicable disease policy and plan initiated by the Jail in 2007 shall be completely implemented within 120 days of the Effective Date of this MOU. Medical staff, including the Jail physician and HSA, shall work with the County and the local public health department in developing the communicable

disease plan. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

**D.     Access to Treatment**

24.     Access to Medical and Mental Health Services: The County shall ensure that all Detainees have adequate opportunity to request and receive timely medical and mental health care through written sick call requests that are collected by medical staff without requiring Jailer involvement. For illiterate Detainees (only), the County shall permit such Detainees to have access to the sick call system orally by requesting access through a Jailer, who must then fill out a request slip for the Detainee within a reasonable time after the oral request. The HSA shall screen all written requests for medical and/or mental health care within twenty-four (24) hours of submission, and see patients within the next seventy-two (72) hours, or sooner if medically appropriate. The County shall develop and implement a sick call policy and procedure which includes an explanation of the order in which to schedule patients, a procedure for scheduling patients, where patients should be treated, the requirements for clinical evaluations, and the maintenance of a sick call log. Treatment of Detainees in response to a sick call slip shall occur in a clinical setting. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

25.     Referrals for Specialty Care: The County shall ensure that - (a) Detainees whose serious medical or mental health needs exceed the services available at the Jail shall be referred in a timely manner to appropriate medical or mental health care professionals; (b) the findings and recommendations of such professionals are tracked and documented in Detainees' medical files; and (c) treatment

17

recommendations are followed as clinically indicated. The County shall maintain sufficient security staff to ensure that Detainees requiring treatment are escorted to appointments in a timely manner. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

26. <u>Access to Emergency Care</u>: The County shall train medical and security staff to recognize and respond appropriately to medical and mental health emergencies. Furthermore, the County shall ensure that Detainees with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

27. <u>Chronic Disease Management Program</u>: The County shall develop and implement a written chronic care disease management program, consistent with generally accepted correctional standards, which provides Detainees suffering from chronic illnesses with appropriate diagnosis, treatment, monitoring, and continuity of care. As part of this program, The County shall maintain a registry of Detainees with chronic diseases. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

28. <u>Drug and Alcohol Withdrawal Identification and Treatment</u>: The County shall ensure that all Detainees demonstrating symptoms of drug and alcohol withdrawal are timely identified. The County shall provide appropriate treatment, housing and medical supervision for drug and alcohol withdrawal. Without admitting

18

prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

29.     Pregnant Detainees:  The County shall ensure that pregnant Detainees are provided adequate pre-natal care in accordance with generally accepted correctional standards of care.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

E.     **Medication**

30.     Medication Administration:  The County shall ensure that all medications, including psychotropic medications, are prescribed appropriately and administered in a timely manner to adequately address the serious medical and mental health needs of Detainees.  The County shall ensure that Detainees who are prescribed medications for chronic illnesses that are not used on a routine schedule, including inhalers for the treatment of asthma, have access to those medications as medically appropriate.  The County shall develop and implement adequate policies and procedures for medication administration and adherence. The County shall ensure that the prescribing practitioner is notified if a patient misses a medication dose on three consecutive days, and shall document that notice and take appropriate follow-up action.  The County shall ensure that medication administration records are appropriately completed and maintained in each Detainee's medical record.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

31.     Continuity of Medication:  The County shall ensure that arriving Detainees who report that they have been prescribed medications shall receive the same or comparable medication as soon as is reasonably possible upon verification that

19

the medication is appropriate, unless a medical professional determines such medication is inconsistent with generally accepted correctional standards. If the Detainee's reported medication is ordered discontinued or changed by a medical professional, a medical professional shall conduct and document a face-to-face evaluation of the Detainee as medically appropriate. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

**F.     Mental Health Care**

32.    Mental Health Treatment: The County shall ensure that a qualified mental health professional provides timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities to Detainees requiring mental health services, Detainees who become suicidal, and Detainees who enter the Jail with serious mental health needs or develop serious mental health needs while incarcerated. In the interim, the County shall coordinate with the Oklahoma Department of Mental Health to obtain additional resources and improve coordination for mental health care in the Jail. The County will also consult with qualified mental health expert(s) on developing in-house mental health programs. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

33.    Mental Illness Training: The County shall conduct initial and periodic training for all security staff on how to recognize symptoms of mental illness and respond appropriately. Such training shall be conducted by a registered nurse and shall include instruction on how to recognize and respond to mental health emergencies. Without admitting prior deficiencies, the County of Oklahoma

20

County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

34.     Mental Health Assessment and Referral:  The County shall develop and implement adequate policies, procedures, and practices consistent with generally accepted correctional standards to ensure timely and appropriate mental health assessments by a qualified mental health professional for any Detainee who becomes suicidal and those Detainees whose mental health histories, whose responses to initial screening questions, or whose behavior indicate a need for such an assessment.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

## V.    SUICIDE PREVENTION

35.     Suicide Prevention Policy:  The County shall implement a suicide prevention policy that includes the following provisions - (a) training; (b) intake screening/assessment; (c) communication; (d) housing; (e) observation; (f) intervention; and (g) mortality and morbidity review.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

36.     Suicide Prevention Education Curriculum:  The County shall implement a suicide prevention education curriculum that will include the following topics - (a) the suicide prevention policy as revised consistent with this MOU; (b) how facility environments may contribute to suicidal behavior; (c) potential predisposing factors to suicide; (d) high risk suicide periods; (e) warning signs and symptoms of suicidal behavior; (f) case studies of recent suicides and serious suicide attempts; (g) mock demonstrations regarding the proper response to a suicide attempt; and (h) the proper use of emergency equipment.  Without admitting prior

21

deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

37. <u>Staff Training</u>:  Within six months of the effective date of this MOU, the County shall ensure that all existing and newly hired Jailers and medical staff receive training on the suicide prevention curriculum described above.  The County shall ensure that Jailers receive both initial and annual refresher training on the suicide curriculum.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

38. <u>Initial Suicide Risk Screening</u>:  The County shall develop and implement policies and procedures pertaining to intake screening in order to identify newly arrived Detainees who may be at risk for suicide.  The screening process shall include inquiry regarding - (a) past suicidal ideation and/or attempts; (b) current ideation, threat, plan; (c) prior mental health treatment/hospitalization; (d) recent significant loss (job, relationship death of family member/friend, etc.); (e) history of suicidal behavior by family member/close friend; (f) suicide risk during prior confinement in a state facility; and (g) arresting/transporting officer(s) belief that the Detainee is currently at risk.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

39. <u>Housing</u>:  Within 12 months from the effective date of this MOU, the County shall provide safe housing and adequate supervision of suicidal detainees in suicide-resistant cells.  Suicide-resistant cells shall include replacement or modification of fixtures (<u>e.g.</u> grates, cell bars, or faucets) that can be conducive to hanging so that they are suicide-resistant.  The location of the cells shall provide full visibility to staff.  Without admitting prior deficiencies, the County of

22

Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

40. <u>Observation</u>: The County shall develop and implement policies and procedures pertaining to observation of suicidal Detainees, whereby a Detainee who is not actively suicidal, but expresses suicidal ideation (<u>e.g.</u>, expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-destructive behavior, or a Detainee who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior, indicating the potential for self-injury, shall be placed under "Close Observation Status" and observed by staff at staggered intervals not to exceed every 15 minutes. A Detainee who is actively suicidal, either threatening or engaging in self-injurious behavior, shall be placed on "Constant Watch Status" and observed by staff on a continuous, uninterrupted basis. Any observer responsible for a suicide watch shall have a clear, unobstructed view of the suicidal Detainee at all times. Suicide checks shall be logged at least once every 15 minutes, at staggered intervals, by Jailers. Any Detainee on suicide precautions shall be referred for a mental health care assessment and treatment. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

41. <u>Suicide Risk Assessment</u>: The County shall ensure that a formalized suicide risk assessment by a qualified mental health professional is performed within an appropriate time not to exceed 48 hours of the initiation of suicide precautions. The assessment of suicide risk by qualified mental health professionals shall include, but not be limited to, the following - (a) description of the antecedent events and precipitating factors; (b) suicidal indicators; (c) mental status examination; (d) previous psychiatric and suicide risk history, level of lethality;

23

(e) current medication and diagnosis; and (f) recommendations/treatment plan. Findings from the assessment shall be documented on both the assessment form and health care record. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

42.  Step-Down Observation: The County shall develop and implement a "step-down" level of observation whereby Detainees on suicide precaution are released gradually from more restrictive levels of supervision to less restrictive levels for an appropriate period of time prior to their discharge from suicide precautions. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

43.  Discharge from Suicide Precautions: The County shall ensure that Detainees are not discharged from suicide precautions without an evaluation and recommendation by a qualified mental health professional. All Detainees discharged from suicide precautions shall continue to receive follow-up assessments in accordance with a treatment plan developed by a qualified mental health professional(s). Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

## VI.  ENVIRONMENTAL HEALTH AND SAFETY

### A.  General Sanitation

44.  Cleanliness: The County shall maintain a clean and sanitary Jail. Within 60 days after entry of this MOU, the County will thoroughly clean, refurbish, and fumigate the existing Jail facility as needed. Afterwards, the County shall regularly clean and maintain the Jail pursuant to a general housekeeping and

24

maintenance plan. Detainees shall be provided cleaning materials on a daily basis or more frequent as appropriate, but the County is ultimately responsible for the Jail's cleanliness and physical condition. The County shall assign a Jailer supervisor responsibility for overseeing implementation of the housekeeping and maintenance plan. This supervisor shall be responsible for overseeing any staff or detainees responsible for ensuring that needed sanitation and cleaning actually occur. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

45.  Plumbing and Ventilation:  In order to maintain sanitary living conditions, prevent Detainee injuries, and reduce the risk of infectious disease transmission, the County shall ensure that plumbing and ventilation systems are adequately maintained and installed. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

46.  Pest Control:  The County shall develop and implement a reasonably integrated pest management program at the Jail. The County shall continue to contract for routine, professional exterminator services, including routine spraying and follow up as needed. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

47.  Laundry:  The County shall develop and implement policies and procedures for laundry procedures to protect Detainees from risk of exposure to contagious disease, bodily fluids, and pathogens. The County shall ensure that Detainees are provided clean clothing, underclothing, and bedding in compliance with policy, and that the laundry exchange schedule provides equitable distribution and pickup

service to all housing areas.  Without admitting prior deficiencies, the County of
Oklahoma County will continue striving to provide constitutional standards of
care to all detainees and inmates at the Jail.

48.   <u>Infection Control Plan</u>:  The County shall develop and implement an infection
control plan that addresses contact, blood borne, and airborne hazards and
infections.  In particular, the plan shall include provisions for the identification,
treatment, and control of Methicillin-Resistant Staphylococcus Aureus and
tuberculosis at the Jail.  Without admitting prior deficiencies, the County of
Oklahoma County will continue striving to provide constitutional standards of
care to all detainees and inmates at the Jail.

49.   <u>Food Service</u>:  The County shall ensure that the food service program at the Jail is
operated in a safe and hygienic manner.  To reduce the risks of food-borne
illnesses, the County shall develop and implement a food service plan to ensure -
(a) safe food preparation, handling, and storage; (b) proper sanitation of food
preparation areas and equipment; and (c) appropriate training and supervision of
persons responsible for food service.  Without admitting prior deficiencies, the
County of Oklahoma County will continue striving to provide constitutional
standards of care to all detainees and inmates at the Jail.

**B.   Fire Safety**

50.   <u>Fire and Life Safety Equipment</u>:  The County shall ensure that the Jail has
adequate fire and life safety equipment, including properly installed and
maintained smoke detectors and fire alarms in all housing areas.  The County
shall ensure that all fire and life safety equipment is properly maintained and
inspected, with adequate documentation thereof.  Without admitting prior
deficiencies, the County of Oklahoma County will continue striving to provide
constitutional standards of care to all detainees and inmates at the Jail.

26

51.   Fire Procedure Training:  The County shall implement competency-based testing for staff regarding fire/emergency procedures.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

52.   Fire Safety Plan/Drill:  The County shall develop and implement a written comprehensive fire safety and emergency/disaster plan, and ensure that staff are appropriately trained in implementing the plan.  Mock fire drills shall also be conducted to ensure staff are familiar with safe safety procedures and evacuation methods.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

53.   Key Control:  The County shall ensure that emergency keys are appropriately marked and identifiable by touch, and consistently stored in a quickly accessible location, and that staff are adequately trained in the use of the emergency keys. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

54.   Exit Plans:  The County shall post and maintain clearly labeled fire exit plans which are accepted by the Fire Marshal.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

55.   Flammable Materials:  The County shall control combustibles and eliminate highly flammable materials throughout Detainee living areas.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

27

56.     <u>Emergency Preparedness</u>:  The County shall maintain the Jail in a manner that provides adequate fire safety.  The County shall take all reasonable measures to ensure that - (a) Detainees can be evacuated in a safe and timely manner during an emergency; (b) emergency exit routes are free of obstacles, maintained in a safe manner, and available for use; (c) emergency keys are readily accessible to staff. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

## VII.    QUALITY ASSURANCE

57.     <u>Policies and Procedures</u>:  The County shall develop and implement written quality assurance policies and procedures to regularly assess and ensure compliance with the terms of this MOU.  These policies and procedures shall include, at a minimum - (a) provisions requiring an annual quality management plan and annual evaluation; (b) quantitative performance measurement tools; (c) tracking and trending of data; (d) morbidity and mortality reviews with self-critical analysis; and (e) review of Detainees' emergency room visits and hospitalizations. Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

58.     <u>Corrective Action Plans:</u>  The County shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities.  The County shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.  Without admitting prior deficiencies, the County of Oklahoma County will continue striving to provide constitutional standards of care to all detainees and inmates at the Jail.

## VIII.   CONSTITUTIONALLY SOUND FACILITY

59.     In order to ensure that the Jail is operated in accordance with Constitutional requirements, the County shall ensure that all Oklahoma County agencies take any actions necessary to comply with the provisions of this MOU

60.     Physical Plant: By four years from the effective date of this MOU, the County shall house all Oklahoma County Jail Detainees at a facility that meets minimum constitutional standards.  By this date, the County will house Detainees in a facility that complies with this MOU.  The parties anticipate that the County will either improve or renovate the existing Jail facility or begin efforts to replace or expand the current Jail with a new facility or facilities to meet the requirements of this MOU.  In accordance with this, the County shall create a commission or similar entity, to develop a series of recommendations, and appropriate timetables to address this Jail expansion and renovation program.  The renovated, new, or expanded Jail shall include adequate numbers of security cells to address security and classification needs, appropriate security design features to ensure adequate Detainee safety, and adequate medical and mental health clinical space.  The County shall ensure that any renovation or construction complies with generally accepted correctional standards and all applicable local and federal law.

## IX.     COMPLIANCE, REPORTING, AND DOJ MONITORING

### A.     Substantial Compliance

61.     Substantial Compliance: Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance.  At the same time, temporary compliance during a period of otherwise sustained non-compliance shall not constitute substantial compliance.

29

62.   <u>Compliance Timeline</u>:  The County shall begin implementing this MOU immediately upon its Effective Date.  Except where otherwise specifically indicated, the County shall complete implementation of all the provisions of this MOU within one hundred and 180 days after the Effective Date.  If the County is unable to complete implementation of any provision within this time period, the County shall request an extension from the United States, which shall include the reason(s) for the failure to meet the timeline.  If the County fails to implement the terms of this MOU on a timely basis, the United States may take  appropriate action, including filing litigation to seek relief, at any time.

63.   <u>Emergency Situations</u>:  If the County's non-compliance with any provision of this MOU constitutes an emergency (<u>i.e.</u>, an imminent threat to the health, safety, or life of a Detainee or Detainees), the United States may file for immediate injunctive relief to remedy the deficient condition(s) or practice(s) at the Jail.

**B.   Compliance Reporting**

64.   The County shall submit quarterly compliance reports to the United States, the first of which shall be filed within 90 days of the date of this MOU.  Thereafter, the quarterly reports shall be filed 15 days after the termination of each four-month period thereafter until the MOU is terminated.  Each compliance report shall describe the actions the County has taken during the reporting period to implement this MOU and shall make specific reference to the MOU provisions being implemented.

65.   The County shall maintain sufficient records to document that the requirements of this MOU are being properly implemented and shall make such records available at all reasonable times for inspection and copying by the United States.  In addition, the County shall maintain and submit upon request records or other documents to verify that they have taken such actions as described in their

30

compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, and incident reports) and will also provide all documents reasonably requested by the United States.

**C.      Compliance Monitoring**

66.      DOJ representatives, with their experts, shall conduct periodic, on-site compliance monitoring tours.  The County shall provide DOJ representatives with reasonable access to Detainees and staff, documents, and information relating to implementation of this MOU.  DOJ shall have the right to conduct confidential interviews with Detainees, and to conduct interviews with facility staff outside the presence of other staff or supervisors.  The DOJ's right of access includes all documents regarding medical care, mental health care, suicide prevention, or protocols or analyses involving one of those subject areas.

**D.      General Provisions**

67.      <u>Dissemination of MOU</u>:  Within 30 days of the effective date of this MOU, the County shall distribute copies of the MOU to all relevant staff, including all medical and security staff at the Jail and explain it as appropriate.

68.      <u>Successors</u>:  This MOU, to the degree allowed by law, shall be applicable to and binding upon all parties, their officers, agents, employees, assigns, and their successors in office.

69.      <u>Costs</u>:  All parties shall bear their own costs, including attorney fees.

70.      <u>Unforeseen Delay</u>:  If any unforeseen circumstance occurs which causes a failure to timely carry out any requirements of this MOU, the County shall notify DOJ in writing as soon as possible, but no later than 20 calendar days of the time that the County became aware of the unforeseen circumstance and its impact on the County's ability to perform under the MOU.  The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the

failure. The County shall implement all reasonable measures to avoid or minimize any such failure.

71. <u>Non-Retaliation</u>: The County shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this MOU.

72. <u>Notice</u>: "Notice" under this MOU shall be provided by overnight delivery or U.S. regular mail and shall be provided to counsel for the County and counsel for the United States.

73. <u>Subheadings</u>: All subheadings in this MOU are written for convenience of locating individual provisions. If questions arise as to the meanings of individual provisions, the parties shall follow the text of each provision.

## X. <u>TERMINATION</u>

74. This MOU shall terminate five years after the effective date of the MOU, if the parties agree that the Jail is in substantial compliance with all provisions of this Agreement and has maintained substantial compliance with all provisions for twelve (12) months. The United States shall conduct a baseline compliance tour no later than 150 days after execution of this MOU. After DOJ issues its assessment and recommendations from this baseline tour, the County may request a re-assessment every six months thereafter. The Department of Justice acknowledges and agrees that if the County of Oklahoma County attains substantial compliance with one or more of the provisions of this MOU, the Department of Justice shall state such in writing to the Board of County Commissioners of Oklahoma County identifying the provision or provisions in which the County is in compliance. Furthermore, if such compliance is maintained for a year after the initial finding of substantial compliance, the United

States shall agree to release Oklahoma County from that provision of the MOU. The burden shall be on the County to demonstrate that it has maintained substantial compliance with each of the provisions of this MOU. The parties shall notify each other of any court challenge to this MOU.

75. If, after reasonable notice to the County, and a reasonable opportunity to cure any deficiencies identified in writing, the United States determines that the County has not substantially complied with this MOU, the United States may pursue litigation against the County.  Notwithstanding the foregoing, the United States reserves the right to file an action under CRIPA alleging a pattern or practice of unconstitutional conditions at the Jail at any time if it believes that the County of Oklahoma County is not making a good faith effort to substantially comply with this MOU or if there is an emergent situation involving an imminent, serious threat to the life, health, or safety of inmates or staff.

76. Failure by any party to enforce this entire MOU or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce any deadlines and provisions of this MOU.

77. This MOU is the complete agreement between the parties addressing the United States' investigation into conditions at the Jail pursuant to CRIPA.  With the exception of DOJ's findings letter referenced in the Preamble herein and any DOJ technical assistance recommendations, no prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein, in litigation, or in any other proceeding.

## XI.   **MODIFICATION OF THE MOU**

78.   If, at any time, any party to this MOU desires to modify it for any reason, that party will notify the other parties in writing of the proposed modification and the reasons therefor.  No modification will occur unless there is written agreement by the parties.

FOR THE UNITED STATES:


THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division


/s Samuel R. Bagenstos
_____
SAMUEL R. BAGENSTOS
Deputy Assistant Attorney General


/s Shanetta Y. Cutlar
_____
SHANETTA Y. CUTLAR
Chief
Special Litigation Section


/s Tammie M. Gregg
_____
TAMMIE M. GREGG
Deputy Chief
Special Litigation Section


/s Verlin H. Deerinwater        11/5/09
_____
VERLIN H. DEERINWATER
CHRISTOPER N. CHENG
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
601 D Street, NW
Washington, DC  20004
(202) 514-6255
(202) 514-6273 (fax)
verlin.deerinwater@usdoj.gov
christopher.cheng@usdoj.gov

35

APPROVED by the BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY, OKLAHOMA this __28th__ day of __October__ , __2009__ .

**BOARD OF COUNTY COMMISSIONERS
OF OKLAHOMA COUNTY, OKLAHOMA**

BY: _/s Raymond L. Vaughn_
_____
Chairman

BY: _/s Willa Johnson_
_____
Member

BY: _/s Brian Maughan_
_____
Member

**ATTEST:**

_/s Carolynn Caudill_
_____
Carolynn Caudill, County Clerk

Approved as to form and legality this __28th__ day of __October__ , __2009__

_/s David W. Prater_
_____
David W. Prater, District Attorney,

36